# Ross and Ross *v.* Duncan *et al.*, and same *v.* Vertner *et al.*

If a trust be an illegal one, it can make no difference whether it be tacit or expressed, the same consequences must follow it in either character.

It is competent for a slaveholder, during his lifetime, to take his slaves to Liberia or elsewhere, there to remain free from the condition of slavery.

The right to dispose of property by will, is as broad and comprehensive as the right of disposition while living.

The statute of this state regulating the manumission of slaves does not prohibit, either in letter or spirit, a citizen from directing by will that his slaves shall be removed out of the state to Liberia, or elsewhere, even though the consequences or avowed intention may be emancipation. The right to emancipate slaves is not taken away; it is only qualified when exercised within the borders of this state.

The court will not look beyond the act of removing slaves from this state to their place of destination, to see whether by the laws of that place emancipation would be a consequence of such removal, in order to establish a fraud upon the laws of Mississippi.

A trust may be created which may be perfectly consistent with the law, and yet the law may have pointed out no mode of enforcement; still it would not interpose to prevent its enforcement, but would leave its execution to the voluntary action of the trustee.

A person may convey his property upon what trust or condition he pleases, so that it be not against law, and the court would only interfere at the instance of the heirs or distributees of the grantor or testator, where there had been a failure or refusal to perform the condition of the trust.

Where the testator, by will, directed his executors to send his slaves to Africa, under the direction and superintendence of the American Colonization Society, provided that a majority of the whole number of said slaves should elect to go there, it was held to be a lawful trust.

As a general rule, there must be an answer to the charge of fraud; when, however, fraud is charged as a conclusion of law from a particular state of facts set out, it is believed the reason of the application of the rule fails.

On the 26th day of August, 1834, Isaac Ross made his last will and testament, to which he afterwards attached several codicils. The said will and codicils are in the words following, to wit:

"In the name of God, amen: I, Isaac Ross, of the county of Jefferson, and state of Mississippi, being of sound mind and disposing memory, do make this my last will and testament, hereby revoking all and every other will or wills by me heretofore made.

In the first place I give and commend my soul to that merciful Being who formed it, and my body to the earth, to be decently interred at the discretion of, and in such manner and form, as my executors, hereinafter to be named, may deem fit and advisable.

In the second place, I give and bequeath to my grand daughter, Adelaide Wade, the sum of ten thousand dollars, to be paid her within twelve months after my decease. I also give and bequeath to my said grand daughter, Adelaide Wade, my negro woman cook, named Grace, and all her children living at the time of my decease, unless the said negro woman Grace should elect, of her own free will and accord, to go to Africa, as hereinafter provided, in which event she and her children to be transported thither, upon the same footing with my other slaves. I also will and desire that my grand daughter, Adelaide Wade, shall take charge of and maintain comfortably during the remainder of their lives, my negro man Hannibal and his three sisters, viz: Daphne, Dinah and Rebecca, and I give and bequeath to Hannibal the sum of one hundred dollars annually during the remainder of his life, and to his above mentioned sisters, Daphne, Dinah and Rebecca, the sum of fifty dollars each, to be paid them annually by my executors, on the first day of January in each year: and it is my further will and desire, that if the said Hannibal and his three sisters, Daphne, Dinah and Rebecca, should elect to go to Africa in preference to remaining under the care of my grand daughter, Adelaide Wade, they shall be permitted to do so, and shall be sent upon the same footing with my other slaves, with this express understanding, however, (which is to be fully explained to them by my executors,) that if they do elect to go to Africa, the legacies above bequeathed to them are to be null and void.

In the third place, I will and desire that my slave Enoch and his wife Merrilla and her children be, within twelve months after my decease, conveyed to such free state as Enoch may elect, free of expense to them, and that the said Enoch and his wife Merrilla and her children be then and there legally manumitted, and

the sum of five hundred silver dollars paid to him the said Enoch, at the time of manumitting him. It is further my will and desire that if the said Enoch should elect to go to Africa, he with his wife Merrilla and her children, shall be sent there upon the same footing with my other slaves, and that the above mentioned sum of five hundred silver dollars be paid him by my executors at the time of his departure.

In the fourth place, it is my will and desire that should a crop be planted (or about to be planted) at the time of my decease, such crop shall be worked out, gathered and sold, and within ten days after the complete finishing of the crop, or if at the time of my decease the crop shall have just been gathered and completed, then within ten days thereafter, all my slaves of the ages of twenty-one years and upwards, except Grace and her children, Hannibal, Daphne, Dinah, Rebecca, Enoch and Merrilla and her children, be called together by my executors, and the provisions of this will then and there explained to them, and the question put to them whether they will go to Africa upon the terms hereinafter specified. If a majority of the whole number thus called together of the ages of twenty-one years and upwards, shall elect to go to Africa, then it is my will and desire that all of those thus called together, and all my other slaves, excepting always Grace and her children, Hannibal, Dinah, Daphne, Rebecca, Enoch, Merrilla and her children, shall be sent to Africa, under the directions and superintendance of the American Colonization Society. And it is my will and desire, then and in that event, that the entire balance of my estate, both real, personal and mixed, excepting always Grace and her children, Hannibal, Daphne, Dinah, Rebecca, Enoch and Merrilla and her children, be exposed to sale at public auction, one month's public notice being first given thereof in the papers printed at Port Gibson and Natchez, and the same sold on the following terms, to wit: one half of the purchase money to be paid in cash, and the other half in twelve months from the day of sale, bond and unexceptionable security to be required of the purchasers, and to be judged of by my executors. It is further my will and desire that the proceeds of the sale, together with any money that may be on hand at the time of my decease, and any that may be owing to me, after deducting the amounts necessary

for the payment of the legacies herein bequeathed, and all necessary expenses that may be incurred, be paid over to the American Colonization Society, provided they will agree to appropriate it in the following manner, to wit: First, to pay the expense of transporting my slaves to Africa; and, secondly, to expend the remainder for the support and maintenance of said slaves when there, the same to be done in such manner as the society in their discretion may deem most to the interest and welfare of said slaves.

If, however, upon my slaves being called together by my executors, in manner and form as above directed, a majority of the whole number of the ages of twenty-one years and upwards, always excepting Grace and her children, Hannibal, Daphne, Dinah, Rebecca, Enoch and Merrilla and her children, should refuse to go to Africa, then it is my will and desire that all of my slaves, always excepting Grace and her children, Hannibal, Dinah, Daphne, Rebecca, Enoch and Merrilla, his wife and her children, shall be exposed to sale, at public auction, at the same time, in the same manner, upon the same terms and subject to the same regulations with the remainder of my estate as hereinbefore provided, with this understanding, that they be sold in such lots as my executors may deem best calculated to command the highest prices, and with this further and most express understanding and provision, that the families are not to be separated.

Then and in this event, it is my will and desire that the proceeds of such sale, together with any money that may be on hand at the time of my decease, and any that may be owing to me, after deducting the sums that may be required to pay all the legacies herein bequeathed, and all other necessary expenses, be paid over by the executors to the American Colonization Society, upon the condition that they form a fund of it, or vest it in such a manner as to bring in not less than six per cent. interest per annum, which interest is to be applied by them to the establishment and support of one single seminary or institution of learning in Liberia. And it is further my will and desire that said fund shall be continued and kept at interest, and the interest appropriated as above for the benefit of said seminary, for the term of one hundred years after my decease, at the expiration of which time I desire that all that remoins may be given up to any gov-

ernment that may be in existence at the time in Liberia, to be appropriated by them in the same manner to the support and continuance of the same institution. But if at that time there should be no government in Liberia, then it is my will and desire that the same be given up to the government of the state of Mississippi, to be by them appropriated to the establishment or support of some one institution of learning within the state, which they in their discretion may select.

To carry the above provisions and bequests into full and entire effect, I do hereby nominate and constitute Daniel Vertner, James P. Parker, Dr. Elias Ogden, now of Natchez, Isaac Ross Wade, and John B. Coleman, executors of this my last will and testament.

In witness whereof, I have hereunto set my hand and affixed my seal, this 26th day of August, 1834.

ISAAC ROSS.

Signed, sealed and acknowledged in presence of us.

JNO. B. COLEMAN,<br>PETER C. CHAMBLISS.

By way of codicil to my last will and testament, and in addition to the matters and things therein contained, it is my will and desire,

First. That forty feet square of the land appropriated by me for my family burying ground, be reserved from sale, and held in trust by my executors and their successors forever.

Second. That whereas I have left it optional with my negro woman Grace and her children to go to Africa, with my other slaves; now if the said Grace shall elect to go to Africa with her children, it is my will and desire that the sum of two thousand dollars be paid by my executors to my granddaughter Adelaide Wade, in addition to the sum of ten thousand dollars, already bequeathed to her.

Third. I give and bequeath to my grandson Isaac Ross Wade, my secretary and book case, and all my books of every kind and description.

Fourth. It is my will and desire that no security is to be required from my executors, Daniel Vertner, James P. Parker, Dr. Elias Ogden, Isaac Ross Wade, and John B. Coleman.

Ross and Ross *v.* Duncan *et al.,* and same *v.* Vertner *et al.*

In witness whereof, I have hereunto set my hand and affixed my seal, this 17th day of October, 1834.

ISAAC ROSS.

Signed, sealed and acknowledged in presence of us.

SARAH WILSON,
OLIVIA M. SKINNER,
B. C. COOK.

By way of further codicil to my last will and testament, it is my desire, upon mature reflection, to alter some of the provisions therein.

First. In relation to that part of my will which provides for taking the voice of my negroes in relation to their going to Africa, or remaining here and being sold; I now desire that those who wish to go to Africa be allowed the privilege of doing so, upon the terms and conditions heretofore provided, and those who elect to remain, be suffered to remain, and be sold as previously directed, and the proceeds of their sale applied under the provisions of the will, for the benefit of those who elect to go to Africa.

It is further my will and desire that the privilege of electing to go to Africa be withheld from Tom, William, Joe, Alick, and Henrietta, being the negroes I bought from Franklin in 1833 and 1834; and from Jeffrey, the son of Harry; and that they be sold by my executors, in manner and form as provided in the previous part of my will, and the proceeds of their sale appropriated as therein directed.

It is further my will and desire that if Hannibal elect to go to Africa, instead of the provision heretofore made for him in that event, he shall be paid, at the time he starts, the sum of five hundred silver dollars. And it is also my will and desire that if my man Dunke elects to go to Africa, he shall also receive at the time of his departure, the sum of five hundred silver dollars.

In witness whereof, I have hereunto set my hand and affixed my seal, this 24th day of February, 1835. ISAAC ROSS.

Signed and sealed in the presence of us.

B. C. COOK,
JOHN B. COLEMAN.

By way of further codicil to this my last will and testament, it is my will and desire that my daughter, Margaret A. Reed, have the uncontrolled use (and occupation) of my house wherein I now reside, with all the offices and buildings appertaining to it, and all the land attached to it which may be necessary for her comfortable enjoyment of it as a dwelling, together with all the furniture of every kind and description in or attached to it, and likewise all the yard and house servants, for and during the term of her natural life, or until she shall think proper and desire to relinquish the possession thereof.

And it is further my will and desire that the sale of my estate, as directed in a previous portion of my will, be postponed until after the death or relinquishment of possession of my said daughter Margaret A. Reed; and the plantation be cultivated under the direction of my executors, and the proceeds of the crops, received by them, to be ultimately applied as heretofore directed in my will.

In witness whereof, I have hereunto set my hand and affixed my seal, this 16th day of March, 1835.

ISAAC ROSS.

Signed and sealed in the presence of us,

SARAH R. WOODWARD,
JOHN B. COLEMAN,
WALTER WADE.

By way of further codicil to this my last will and testament, I do hereby revoke and declare null and void that portion of my will relating to my man slave Enoch and his wife Merrilla and her children; and I do now will that my said man slave Enoch be absolutely sold by my executors, without the privilege of choosing between going to Liberia and being sold here, and the legacy bequeathed to him in the previous part of my will is entirely revoked. I do likewise will that Merrilla and her children be put upon the same footing with my other negroes, and allowed a choice between going to Liberia or remaining here and being sold, as directed in the previous portions of my will.

In witness whereof, I have hereunto set my hand and affixed my seal, this 17th day of June, 1835.

ISAAC ROSS.

Signed and sealed in the presence of us,
> JOHN B. COLEMAN,
> ISAAC R. WADE.

*Jefferson county and state of Mississippi:*

We, the undersigned, do hereby certify that during the last illness of captain Isaac Ross, at his dwelling house in said county, on or about the 15th day of January, 1836, being, as well as we recollect, about three or four days previous to his death, he called us to his couch and stated to us that it was his will and desire that in the event of his man slave Enoch serving Mrs. Margaret A. Reed faithfully and well during her life, then that portion of the codicil to his, the said Isaac Ross's, last will and testament, which deprived Enoch of the privileges and legacies conferred upon him in the main body of the will, should be considered null and void, and the said Enoch, at the time of the ultimate distribution of the property, placed in exactly the same situation as if said codicil had never been written.

Given under our hands and seals this 27th day of January 1836.

MARGARET A. REED,

Attest,                        ISAAC R. WADE.
> JOHN B. COLEMAN,
> D. VERTNER,
> WALTER WADE.

*State of Mississippi, Jefferson county:*

Personally appeared before me, the undersigned, judge of the probate court of Jefferson county, in open court, John B. Coleman, who made oath that he saw Mrs. Margaret A. Reed sign her name to the within statement on the date of said statement, to wit; on the 27th of January, 1836.

JOHN B. COLEMAN.

Sworn and subscribed in the presence of
> JOHN M. WHITNEY,
>> Judge of Probate.

February 24, 1836.

*State of Mississippi, Jefferson county:*

Personally appeared before me, the undersigned, a justice of the peace of Jefferson county, Margaret A. Reed, who made oath that she was called on to sign the within, for the purposes therein contained.

Given under my hand and seal, 21st April, 1836.

ISAAC A. B. ROSS, J. P.

Isaac Ross died on the 19th day of January, 1836, leaving three heirs, to wit: Jane B. Ross, Isaac A. Ross, and one Margaret A. Reed. Margaret A. Reed died before the commencement of this suit, having devised and bequeathed to defendants, Butler and Duncan, all her right and interest in the estate of her father, the said Isaac Ross. Complainants then filed their bill in the court of chancery, as sole remaining heirs of Isaac Ross, to set aside the principal devises and bequests in his will, and to enjoin his executors from proceeding further to execute the same, on the ground that such devises are illegal and void, and that the estate embraced in such illegal and void disposition *results* to said complainants as heirs at law.

The bill set forth the will and codicils thereto, and averred that all the provisions and trusts in relation to the transportation of the slaves of the testator to the coast of Africa, are in violation of the policy of the state of Mississippi on the subject of domestic slavery; in fraud of the statute prohibiting manumission except on certain conditions, and consequently illegal and void. Also, that the direction to sell the remainder of the estate, and to pay over the proceeds to the American Colonization Society, on condition "that they would agree to appropriate it in paying the expense of transporting the said slaves to Africa, and the remainder to be expended for the support and maintainance of said slaves when there, in such manner as the society in their discretion, might deem most to the interest and welfare of said slaves," is illegal and void, because the bequest is in trust for an illegal purpose. Also, that the contingent bequest to the Colonization Society of the proceeds of the sale of testator's estate, in trust for the establishment in Liberia of a seminary of learning, is void,

because against the policy of the state of Mississippi; and also because said society has no capacity by its charter to take for such a purpose.

The bill further avers that all legacies have been paid except those complained of; that the debts of the estate are fully satisfied, and that the executors and American Colonization Society are proceeding to execute the remaining trusts, and will execute the same, unless restrained by injunction, &c.; also, that all the slaves have expressed their desire to be transported to Africa, pursuant to the provisions of the will.

The bill finally prays injunction, &c. and that the estate embraced in said illegal and void trusts, be decreed to the complainants as sole remaining heirs at law. To this bill there was a general demurrer by all the defendants.

By consent, a decree was entered, sustaining the demurrer.

In the case of Mrs. Reed, the bill was filed by complainants as heirs at law of Margaret A. Reed, deceased, to set aside the will of said Margaret, and to establish a resulting trust in favor of themselves.

It set forth the will of Margaret A. Reed, published on the 14th June, 1838, in which all her estate, both real and personal, was devised and bequeathed to complainants. Also, a codicil thereto, published on the 4th day of September, 1838, in which was devised to them all the interest of the said Margaret A. Reed, in and to the estate of her father Isaac Ross, before that time deceased, in case the will of the said Isaac Ross should be declared invalid. The bill further averred the death of Mrs. Reed, and that her said will and the codicil thereto are in fraud and violation of the laws and policy of the state of Mississippi, and therefore void.

It was averred that the estate so devised, was given in secret trust that the said Butler and Duncan should convey all the said slaves of testatrix to Liberia, there to remain free.

In support of this averment, complainants exhibit in their bill a letter from testatrix to defendants, dated 14th June, 1838, which they say points out the secret and illegal trust.

G. HOLT and J. B. THRASHER, for complainants.

Ross and Ross *v.* Duncan *et al.*, and same *v.* Vertner *et al.*

MONTGOMERY and BOYD and S. S. PRENTISS, for defendants.

THE CHANCELLOR.

The complainants bring this suit as the heirs and distributees of Margaret A. Reed, deceased. The allegations of the bill, so far as the demurrer is concerned, are:

That Mrs. Reed, about the 14th June, 1838, made her last will and testament, appointing the defendants her executors, to whom she devised and bequeathed the most of her estate, consisting in part of a large number of negro slaves; that said devises and bequests were made upon the secret trust and confidence that the negroes should be taken by the defendants as the executors of the will to Liberia, there to remain free, &c. A letter from the testatrix of even date with the will is referred to in the bill, which it is alleged is declarative and expressive of the secret trust aforesaid. It is alleged that this secret trust is in violation of the laws of Mississippi, and was intended to evade and defraud the statute which prohibits the emancipation of slaves by last will and testament, except under the restrictions therein enumerated. The complainants pray that the will be set aside, that the estate may be decreed to them, &c. To this bill there is a general demurrer, which at once presents the question of the validity of the will as coupled with the alleged secret trust. If the trust be an illegal one, it can make no difference whether it be tacit or express; the same consequences must follow it in either character. I shall therefore elect to consider the will as having upon its face a devise and bequest to the defendants upon the express trust that the negroes therein mentioned should be taken to Liberia, there to remain free. Several collateral questions were made on the argument, all of which it is believed resolve themselves into this plain and broad proposition: Is a will made within this state, by one of its citizens, in which negro slaves are bequeathed upon the trust that they shall be taken to Liberia, on the coast of Africa, there to remain, void, as being in fraud and violation of our laws and in contravention of their policy upon the subject of domestic slavery? The language of the statute which it is insisted is violated by Mrs. Reed's will, so far as it is applicable to this case, is in the

50*

following words : " It shall not be lawful for any person being the owner of slaves to emancipate them, unless by his or her last will and testament, attested and proved in the manner required by law, and also prove such slaves have performed some merito- rious act for the benefit of such owner, or some distinguished ser- vice for the benefit of the state; and such last will and testament shall not have validity until sanctioned by the legislature, nor until the owner shall have complied with the conditions specified in such act."

Do the terms of the will and trust in question amount to a vio- lation of the provisions of this statute, and to a fraud upon its policy? If so, the will must be declared void, and the complain- ant's right to take will stand unquestioned. If not, the will must have effect, and the executors be left free to carry the accom- panying trust into execution. It is not disputed by counsel on either side, that all acts done in fraud of the law are necessarily void. Submission and obedience to the obligation of public laws, and conformity to its rules of municipal regulation, is one of the first if not the highest duty a citizen owes to his country. Hence all acts done in dereliction of this high duty, which may violate public laws or contravene public policy, have been uniformly held to be void. The law will not permit itself to be overreached by any device, however cunning, nor by any circuity of action, how- ever remote. Whilst it is the duty of courts of justice to preserve the integrity and authority of the law, it is equally their duty to protect the rights of the citizen, and to give effect to his acts, where they involve no violation of his obligations to the social compact. Protection and obedience are reciprocal obligations be- tween the law and the citizen. I presume it will be received as a self-evident proposition, that it was competent and lawful for Mrs. Reed, during her life-time, to have taken her negroes to Liberia or elsewhere, " there to remain free from the condition of slavery."

I do not understand the counsel for complainant as denying this proposition, but they insist that the dominion which Mrs. Reed might have thus legitimately exercised whilst living, as a natural right, ceased at her death ; and a distinction is taken between the right to exercise such power while living, and the right to exer-

cise it through the medium of a last will and testament. And it was assumed as a general principle, that the right to dispose of property by will is more restricted and limited than the right whilst living. I cannot assent to this proposition, thus broadly laid down. It is true, that the right to dispose of property by will is a civil right; or in other words, a right derived from the law : but the source of its derivation does not imply that it is less comprehensive than the living right. A will is defined to be the disposition which one desires may be made of his possessions or property after his death. Justice Blackstone, 2 vol. of his Commentaries, page 11, says, "the power given to a dying person of continuing his property by disposing of his possessions by will, is a kind of secondary law of nature." The word property is here evidently used as synonymous with the word dominion or power, as contra-distinguished from the possession or the thing itself. I think it will sufficiently appear from this reference that as a general rule the right to dispose of property by will is as broad and comprehensive as the right of disposition while living. The distinction attempted to be taken between the two modes of doing the same thing, so far as the policy of the statute is concerned, is not very readily perceived. I conclude, then, that whatever would be a legal disposition of a person's property while living, would be equally lawful when disposed of by last will and testament; unless there is something in this latter mode of conveyance which *ex vi termini* not only restricts the party's rights, but necessarily implies illegality; or unless there is an arbitrary and inflexible rule of municipal law by which the distinction is taken and sustained. And this brings us back to an examination of the statute under which it is insisted that the testament in this case is void by reason of the trust contained in it. It is insisted by the complainant's counsel, that the trust in this case likens itself to the cases in England where conveyances made in trust, to defeat the provisions of the statute of mortmain, have been held to be void, and the cases upon that subject were referred to. The trust in this case distinguishes itself from the cases cited, in this important particular. In this case, the trust is to be executed out of the limits of the state of Mississippi, and upon the coast of Africa; whereas it will be

found in those cases, the execution of the trust was to take place within the territory and in the very face of the law-making power which had prohibited such form of conveyance. But suppose that a subject of Great Britain could hold land in the United States, and he should execute in England a conveyance of such land to a trustee there residing, in trust that he should receive the rents and profits of such land for the use and benefit of an ecclesiastical association: it is believed that the English courts would not recognize any thing in such a conveyance as violating either the provisions or the policy of their statute of mortmain, the provisions of which look only to the title of lands situate within English territory.

The cases cited at the bar from North Carolina, for the purpose of showing that a conveyance of slaves upon trust to be emancipated were held void, because in fraud of the laws and policy of that state, were all cases where it appeared that the trusts were to be executed within that state, and are therefore, not conceived to be applicable to this case. But we must return to the statute of Mississippi, for upon the construction and application of its provisions depends the result of our enquiry. The title of the act under which the provision occurs, which I am called on to construe is, "an act to reduce into one the several acts concerning slaves, free negroes and mulattoes." The entire legislative policy of the country in relation to these three classes of persons, is to be sought for in the body of the act.

The first thing that strikes us with surprise upon reading this statute is, that a provision in relation to last wills and testaments should have occurred under such a title, instead of the more appropriate head found in the same book "concerning last wills and testaments." The mind is prompted to inquire what necessary connection there is between the right of making a last will and testament, and a statute concerning slaves, free negroes and mulattoes? To which one of these distinct and several branches of legislative concern does the right of making a will fitly attach itself? Is it that part which relates to slaves, or that part which relates to mulattoes? Or is it the third branch, relating to free negroes, with which the right to make a will holds affinity? The surprise gives place to a clear perception of the

reason of this apparently unnatural association of subjects, when we perceive that the provision in regard to testaments is exclusively directed to the right of manumitting slaves. And from the statutory connection between the subjects, the conclusion cannot be resisted that the restriction contained upon the testamentary right is a part and parcel of the municipal policy of the country in regard to free negroes. The legislature was acting in part upon the subject of free negroes in this state; and the provision concerning the right to manumit slaves by will was intended to guard against the dangerous influence which might be exerted by negroes thus manumitted over those who remained in bondage. The restriction imposed is but declaratory of that simple but salutary rule of social conduct, that each member of a civil community shall so exercise his dominion over his own property as not to endanger that of others. But the importance of the principle involved in this case, and the great amount of property at stake, seem to demand a more general and thorough view of the subject. It is urged that when the statute has said, "it shall not be lawful to emancipate slaves, unless by last will and testament," in the manner there pointed out, all construction is at an end, the subject is closed, and that any provision in a will by which the emancipation of negroes would be a remote and resulting consequence, even though that emancipation should take place in a foreign country with which the domestic policy of Mississippi could have no concern, it is nevertheless within the prohibition of the statute. A narrow and restricted application of a statute is as likely to fall short of the legislative will, as the more unbridled latitude of construction. Both extremes are to be avoided. One of the cardinal rules in the exposition of statutes is, that the intention of the lawgiver is to be deduced from every part of a statute compared with every other part, and that the intention when thus elicited must always prevail over the literal sense of the terms used. The application of this rule will not be without its point in this case. Let us then compare the provisions of our statute with each other. After declaring that a will emancipating slaves shall not have validity until sanctioned by an act of the legislature, this further provision occurs: "nor until the owner shall have complied with

the conditions specified in such act." This latter paragraph conveys to my mind the clearest conviction that the legislature intended the prohibition to extend only to cases of emancipation within this state, where the slaves were intended to remain. If as in this case, by the very terms of the instrument of emancipation, the manumission was to take place in Liberia, it is difficult to perceive what concern the domestic policy of Mississippi could have in imposing conditions upon the owner. What are the probable conditions which the legislature would impose in such case upon the owner. Such, I presume, as requiring of him bond and security for the good behavior of the negroes, or against their becoming a public charge. Although the colony of Liberia is an object worthy of all philanthropic encouragement, yet it is not to be presumed that Mississippi intended to extend her guardian care so far as to protect that colony by bond and security against the evils of pauperism and breaches of the peace.

Much was said in argument about the construction of statutes, and many of the rules laid down were adverted to and commented on. These artificial expositors of the law all resolve themselves into the single purpose of ascertaining the meaning and good sense of the statute, and whatever conduces to that end may be fairly put in requisition, whether it be drawn from the preamble, title, or body of the act, or from the peculiar history, circumstances and condition of the community for the government of which it may have been enacted. Amongst other rules upon this subject, it is said, statutes are to be construed with reference to the principles of the common law; for it is not to be presumed the legislature intended to make any innovation upon the common law, further than the case absolutely requires. The right to manumit a slave is perfect and undoubted at common law, by will, deed, or otherwise. Did the legislature intend to impose any other restriction upon the common law right of the citizen in this particular, than such as held him in a state of obedience to its municipal policy upon the subject of free negroes? Mississippi has no concern with the question of manumitting slaves elsewhere than within her own limits. She does not assume police jurisdiction beyond them. She has no law which in letter or spirit prohibits a citizen from direct-

Ross and Ross *v.* Duncan *et al.*, and same *v.* Vertner *et al.*

ing by will that his negroes should be removed out of the state, to Liberia or elsewhere, even though the consequences or avowed intention may be emancipation. The right to emancipate is not taken away; it is only qualified when exercised within her borders. The right to remove slaves by one while living, or through the agency of his executors when dead, is no where infringed. And it is presumed that the courts would not look beyond the act of removal to the place of destination, to see whether by the laws of that place emancipation would be a consequence of such removal, in order to establish a sort of constructive fraud upon the laws of Mississippi.

It is difficult to conceive how an act done in Liberia, according to its laws, should involve a violation of those of this state. The rule that every contract, act or agreement, is to be governed by the laws of the place where the execution or performance is to take place, is one of universal application. The execution of the trust in this case, according to the allegations of the bill, is to take place in Liberia. The laws of that place, then, according to the rule, must decide upon its legality. The ground was taken, that as the negroes, for whose benefit the trust was raised, can maintain no suit in our courts to enforce it, and there being no one who can enforce it, the trust, it is insisted, is therefore void. The conclusion does not necessarily follow from the premises. A trust may be created which may be perfectly consistent with the law, and yet the law may have pointed out no mode of enforcement; still it would not interpose to prevent it, but would leave its execution to the voluntary action of the trustee. A person may convey his property upon what trust or condition he pleases, so that it be not against law; and the court would only interfere at the instance of the heirs or distributees of the grantor or testator, when there had been a failure or refusal to perform the condition or trust. These principles I think are plainly deducible from the case in 4 Wheaton 35.

I had some difficulty at first upon the subject of the fraud charged in the bill, as it regards the demurrer. As a general rule, there must be an answer to the charge of fraud. When, however, fraud is charged as a conclusion of law from a particular state of

facts set out, it is believed the reason of the application of the rule fails. )

The demurrer must be sustained, and the bill dismissed.

[The complainants prayed an appeal from this decision, which was granted; and upon argument in the High Court of Errors and Appeals, the opinion of the chancellor was affirmed.

The arguments of counsel in this case were withdrawn, to be used in the High Court. The importance of the case, and the eminence of the counsel on either side, will be a sufficient reason for reporting the arguments at length, together with the opinion of the High Court of Errors and Appeals.]

J. B. THRASHER for appellants.

This is an appeal from the decree of the chancellor entered *pro forma*, sustaining the demurrer to the bill of the complainants. To sustain the bill we propose to establish,

1. That the principal devises in the will, and the whole tenor thereof, constitute indirect attempts to emancipate numerous slaves, contrary to the laws and policy of this state, and in contravention of the same.

2. That the devises in the will which are to slaves, and in trust for slaves who cannot take by devise, are absolutely void; and that the devisees were slaves at the death of the testator, and still remain slaves by the laws of this state.

3. That the devises being void, and the devisees slaves, both descend to the heirs at law, and that the executors hold the same as trustees for the legal heirs, and as such are bound to account to them for the same, and cannot dispose of the estate for charities, or other objects to be selected either by the executors or by the court.

1. In the case of Haywood *v.* McCraven's executors, 2 North Carolina Law Repository, 557, and in numerous other cases, it has been decided that a devise to emancipate slaves, although in some instances to be sent out of the state to foreign countries, is void. The court said, that such a devise is repugnant to the positive provisions by statute, which has pointed out but one method by which slaves can be emancipated, and only one in-

stance in which it can be done at all, to wit: for meritorious services; and such is our statute, see 8 Peters, 285. Can the testator therefore choose a different, or can the executors who represent the deceased, select another method, or can the courts sanction any other than that pointed out by the statute? certainly not: and to this, add the further elementary principle consecrated and acknowledged by the accumulated wisdom of ages, that in a primitive state and by the law of nature, no person had any right or power to make a will, or to make any disposition of property to take effect after his or her death. How then is this power derived of making last wills and testaments? It is derived solely by virtue of conventional powers, conferred on us by municipal regulations, and prescribed by the law-making power of the state. Have we any right or power to disregard this municipal regulation? If we go back to the law of nature or primitive state and adopt that, we cannot make wills. If we devise our property, we must do it by virtue of the *lex loci*, or conventional rights secured to us by government; and when acting under a limited delegated power, the well known maxims of the law and of the government prohibit us from exercising any other powers, than those delegated. If therefore we attempt to emancipate slaves by last will and testament, or by last will and testament to dispose of them in any other manner than that pointed out by the statute, we act in violation of the law or in fraud of the law; and in the case of the Wm. King, 2 Wheaton, 148; and of Lee *v.* Lee, 8 Peters, 50, it is laid down as a general rule, that whatever is done in fraud of law, is done in violation of it. The law, therefore, having made no provisions authorizing persons, by last will and testament to send or direct their slaves to be sent to Africa, or out of the country, it follows as a principle, incontrovertible, that the executors have no power whatever, to send the slaves to Africa, or out of the state; and therefore the devises in the will for such a purpose, are in fraud of the law and cannot be executed.

Solon, says Blackstone, was the first legislator that introduced wills into Athens; but in many other parts of Greece they were totally discountenanced. In Rome they were unknown till the laws of the twelve tables were compiled, which first gave the right

of bequeathing. And among the northern nations, particularly among the Germans, testaments were not received into use. And this variety serves to evince, that the right of making wills and disposing of property after death, is merely a creature of the civil state ; which has permitted it in some countries, and denied it in others ; and even where it is permitted by law, it is subject to different formalities and restrictions in almost every nation under Heaven. 1 Chitty's Blackstone, 411. By the seventy-fifth section of the Revised Code, p. 385, it is declared that it shall not be lawful for any person, being the owner of slaves, to emancipate them by last will and testament or otherwise, unless it is proven to the satisfaction of the General Assembly, that such slave or slaves, have done and performed some meritorious act for the benefit of the owner, or some distinguished service for the benefit of this State; and without the sanction of the legislature, the act of emancipation is void. Such is the law and policy of the laws of this state. The above recited act furnishes conclusive evidence to the court, not only of the law, but of the public policy of the state ; and here it might be well to remark, that this statute has reference solely to the owner or owners of slaves while alive, acting in *propria persona*, and not to the executors or trustees, who have no power to emancipate under the statute, neither for distinguished nor meritorious services, nor for any other cause whatever. With the death of the owner, also dies the power to emancipate his slaves, until they are legally vested in full ownership elsewhere.

An instrument of emancipation must conform to the laws of the country where the emancipator was domiciled at the time of his death, or it is void. Such is the principle settled in 1 Randolph, 234. Story's Conflict of Laws, 215–16–17–18–19, and the case in 6 Randolph, 563–4, shows that an attempt to emancipate slaves contrary to the laws in force at the time, is void, although a trust was created to support it, as in the present case. In the case of Bynum *v.* Boswich, 4 Desauss. 266, the court decided that a bequest of slaves to a trustee with directions to liberate them, was void, being in opposition to the provisions of an act of South Carolina, which forbids emancipation in any other way than by deed executed in the lifetime of the master, a certain time before his

death, and in a prescribed form; and in the case of Cunningham *v.* Cunningham, 1 Taylor, 209, the court decided, that a devise for the maintenance of slaves, was void. See also 3. Amer. Dig. 480.

And in the case of Haywood *v.* McCraven, 2 Car. Law Rep. 557, 3 Amer. Dig. 538, where a testator bequeathed to his executor after the death of his sister, his slaves in trust to have them set free; and also devised and bequeathed to his executors real and personal estate for the use of his slaves, it was held by the court that the bequests were void, as being contrary to the policy of the law, and that whenever the intention was to create a trust that could not be disposed of, the property reverted to the heirs at law, or next of kin: and that a devise of land to be rented out for the maintenance of a slave was void also. C. & N. 352. 3 Amer. Dig. 479.

In the case of Moses *v.* Denigree, 6 Randolph, 561; and 5 Am. Dig. 499, it was decided that a deed of emancipation of a slave executed in 1781, (at which time emancipation was not permitted except in certain cases,) although it directed the freedom to commence when he should come of age, (in 1796,) is absolutely void, notwithstanding the law had been changed so as to admit of emancipation in the mean time. If the slaves had been manumitted conditionally, to have their freedom when the laws would permit, it seems it would have been good, and such is the case in 2 Call's Rep. 319, 357.

No state is under any obligation to give effect to any acts of parties, which contravene its own policy or laws. 2 Story's Eq. 429. Story's Conflict of Laws, 98, sec. 106, says, that no nation will suffer its own subjects to evade the operation of its own fundamental policy or laws, or commit frauds in violation of them.

As the testator, Ross, could not by the laws of this state, free his slaves in Mississippi, they were, unquestionably, slaves at the time of his death, left undevised to any person who could take; and being slaves at his death, they descended to, and vested in his heirs by the law of intestacy, (the debts of the testator all being paid.) 1 How. Rep. 558. Personal property is undoubtedly subject to that law in point of distribution, which governs the owner; in other words to the law of the owner's domicil; real property, to the *lex loci rei sitae.* 2 Kent, 344; 2. Bos. and Pul. 229, note;

3 Ves. 198; 5 Ves. 750; 3 Cranch, 319; 1 Binney, 339; 3 Johns. Ch. Rep. 210; 1 Mason, 408; 4 Greenleaf, 134.

Otherwise to allow the testator to interfere, says Kent, with the established rules of law, would be to permit every man to make a law for himself, and thus to disturb the metes and bounds of property. 4 Kent, 520.

By the second codicil in the will, the provisional devises in favor of the Liberian government and a school, as well as that in favor of the state of Mississippi, and other provisions in the will, are all whittled away, and the freedom of the slaves as well as the authority of the American Colonization Society to transport them to Liberia, is made to depend on the election of the slaves themselves, to be held on the plantation of the testator. That neither the slaves nor the testator could empower the members of the Colonization Society to transport them to Liberia, even did it not contravene the laws and policy of the state, is clear, upon the principle, that the American Colonization Society, if legally in existence as a chartered society or body corporate, was chartered solely for the purpose of transporting free persons of color to Africa, of their own free will and accord; and her corporate powers do not extend to the transportation of slaves.

The negroes of Ross were at the time of his death, and yet are, unquestionably, slaves by the laws of this state.

There is no devise in the will, of the slaves to the Colonization Society, either in trust or otherwise; but in case they elect to go to Africa, the will says that they shall be sent " under the direction and superintendance of the American Colonization Society." This society has nothing to do with them until sent, and then they are only to direct the manner and superintend the voyage, as being best acquainted with the nature of such shipments, and able to give safe counsel in such cases.

The language of the will will bear no other construction.

But it is said, in case a majority of the whole number of slaves should, by election, refuse to go to Africa, then they are all to be sold, and the proceeds paid over to the American Colonization Society, upon condition that they will agree to appropriate the interest on the capital to the establishment and support of one single seminary or institution of learning in Liberia, for one hun-

dred years, and, at the end of that time, both principal and interest are then to be given up to any government that may be in Liberia. But if, at the expiration of the one hundred years, there should be no government in Liberia, then it is to be paid over to the government of Mississippi.

All these latter and visionary provisions of the will, in case a majority of the slaves refuse to go to Africa, are abolished by the second codicil, which, after abolishing that part of the will, directs that such of his slaves as wish to go to Africa shall be allowed the privilege of doing so, and that the balance shall be sold for the benefit of those who elect to go.

The bill avers that all the slaves have elected and determined to go to Africa, and that the executors are now preparing to transport them thither.

The demurrer admits the averment to be true. In such case there is no provision in the will to sell and pay over to the American Colonization Society. They take no interest whatever, nor is there, in such case, any provision in favor of the school or government. So that the will, in truth and in construction, amounts to nothing more nor less than a devise to the slaves themselves of their own freedom, and of the balance of the estate for their benefit.

The devises are therefore void, and the property vests, if not otherwise disposed of by the will, in the next of kin. 4 Wheat. 26–8. That the slaves have no power to emancipate themselves by their own election, and thereby to authorize the members of the American Colonization Society to transport them to Liberia, is evident from the fact that it would be in derogation of the rights of the heirs, and contravene the whole policy and laws of the state on the subject of domestic slavery; and upon this latter principle the executors cannot, nor can the members of the American Colonization Society, transport them:

1. Because, although it may be contended that the liberation from slavery is to take place in a foreign country, and, as it regards the law and policy of this state, is *extra territorium*, yet the principle is well settled, that, when the object of a devise is to be executed in a foreign country, it must not be against the pub-

51*

lic policy of the state where it is sought to be put in execution, or the courts will declare it void. 2 Sto. Eq. 429.

The case of Strickland *v.* Aldridge, was a devise to the Rev'd Adam Aldridge, and his assignees, made upon an implied trust, that he would, upon the devised premises, build and erect a chapel for the Methodist sect, and held void as being contrary to the statute of mortmain, and is very analogous to the case under consideration. 9 Vesey, 516. As, in like manner, the case of Mucklestone *v.* Brown, 6 Vesey, 52. In both cases the devises were contrary to the policy and laws of England. Thus: when a bequest was given in England, in trust for certain nunneries in foreign countries, it was held void. 4 Vesey, 434, note. And, in like manner, when a pecuniary legacy was given for such purposes as the superior of a foreign convent should judge expedient, it was held void, and the court refused to execute it in a foreign country. 6 Vesey, 567. The bequests in both cases being for Roman Catholic establishments, which was against the policy and laws of England. That a deed, says chief justice Boyle, or other instrument purporting on its face to do an act prohibited by law, cannot be valid nor constitute a medium through which a right can be decreed, is a proposition too evident to admit of controversy. The end being interdicted, the means for its accomplishment must be considered illegal and void. 2 Bibb, 58.

2. It is an undoubted maxim in law, that a legacy must take effect at the death of the testator, or be void at that time, and the right vest in another. 3 Peters, 497–8; Ambler, 636,640. If the devise was either to the executors or to the American Colonization Society, in trust, (though there is not the slightest ground for such a construction,) neither can take or hold it individually; they must execute it, or it descends to the heirs. In whom, therefore, did the devises of captain Ross vest at the time of his death? for if they did not legally vest elsewhere, they descend to the heirs at law. They could not vest either in the executors or the American Colonization Society in absolute right. 2 Story's Eq. 427. For if they were devised to them it was in trust. It could not vest in them as trustees, because those for whose use it was devised, (if devised to them,) were, at the time of the testa-

tor's death, and still are, slaves, and incapable in law of taking. A trust for one in law incapable of taking, is void. 2 Fonb. 348; 6 Vesey, 52, 64.

By the provisions in the will, and especially the second codicil thereto, which abolishes the 4th clause in the will, it will be seen that all the principal devises are either direct to the slaves themselves or as declaration of intention without any devise. That slaves cannot take either by devise, descent or purchase, has been settled by this court in the case of Thomas Hinds *v.* Henry Brazeale *et al.*, 2 Howard, 836.

A devise of land to be rented out for the maintenance of a slave is bad. 3 Amer. Dig. 479.

A devise for the maintenance of slaves is void. Sec. 3 Amer. Dig. 480–1; 1 Taylor, 209, in point; 4 Dessaus. 266. Civil Code of Louisiana, 142, art. 945; 8 Martin Rep. 161; 1 Stewart's Ala. Rep. 320.

Where a testator bequeathed his slaves to his executors, after the death of his sister, in trust, to have them set free by the laws of the state; and also devised to his executors real and personal property for the use of his slaves, it was held that the bequests were void, being contrary to the policy of the law. 3 American Digest, 538.

A devise to one incompetent to take is a void devise. 2 Roberts on Wills, 30.

A devisee must be able to take, to make good devise. 1 Roberts, 52.

The slaves, as devisees, are incompetent to take; and there is no devise, either to the executors or to the American Colonization Society, by implication or otherwise.

The will of Isaac Ross, by the 1st, 2d, 3d and 4th clauses, disposes of his entire estate: and these clauses certainly do not contain a devise of any portion of it, either to the American Colonization Society, or the institution of learning contemplated in Liberia; nor to either the government that may be in Liberia one hundred years hence, or to the state of Mississippi after that period, either in *presenti* or in *futuro.*

If, however, (in the language of the will) upon the slaves being called together, a majority of the whole number of the age of

twenty-one years should refuse to go to Africa, then they are all, excepting, &c. to be sold at public auction: and then, and in that event only, are the proceeds of such sale to be paid over to the American Colonization Society, upon the condition that the society will form a fund of it, and apply it according to the provisions relative to the institution of learning and governments spoken of in the will. If a majority of the slaves do not refuse to go to Africa, then there is no fund to apply, no trustee to apply it, and no objects to apply it to. It is therefore upon the condition only and solely that a majority of the slaves refuse to go to Africa, that the provisionary devises in favor of the institution of learning and governments are made to depend, and upon such condition only, is the American Colonization Society constituted trustee.

By the second codicil to the will, the condition upon which the provisionary devises are made to depend, is abolished. The object for which they were made, therefore, ceases to exist, and consequently the appointment of the society as trustee is revoked.

The language of the codicil is in these words:

"By way of further codicil to my last will and testament, it is my desire, upon mature reflection, to alter some of the provisions therein:

"1st. In relation to that part of my will which provides for taking the voice of my negroes in relation to their going to Africa or remaining here and being sold, I now desire that those who wish to go to Africa be allowed the privilege of doing so upon the terms and conditions heretofore provided, and those who elect to remain be suffered to remain, and be sold as previously directed, and the proceeds of their sale be applied under the provisions of the will for the benefit of those who elect to go to Africa."

Can any thing be more clear and certain, than that the foregoing codicil abolishes the sole and only provision in the will upon which the devise in favor of the institution of learning and governments is made to depend, and under which alone the society could claim to act as trustee.

The bill, as before remarked, avers that most, if not all, of the slaves have elected and determined to go to Africa: and the demurrer admits the fact. What, then, becomes of the conditional appointment of the society as trustee, and of the contingent devise

in favor of the institution of learning and governments? They must be numbered among the things that were, but are not, and considered as though they had never been.

It is therefore clear, that neither the executors nor the American Colonization Society can take, either in their own right or as trustees, because in neither capacity was it devised to them: and it is equally clear that a slave cannot be a *cestui que trust:* and thus we find the estate undevised to any person who can legally take. Are we then to be told, that notwithstanding the void devises and inability of any person to execute the will, and the attempted fraud upon the laws and policy of the state, yet that the court will sustain the devises as charities, and execute the will according to the odious doctrine of *cy-pres*, so long a farcical proceeding in the English courts of chancery?

This power, in a court of this state, we dispute.

1. Because the devises are void, both at law and in equity.

2. Because the devises are for a definite object specified—in point of law, not sustainable; and trustees appointed to execute them. In such a case, a court of equity will never execute it in a different manner, as a charity, when it is void at law. If, therefore, (says Judge Story,) the testator had clearly but one particular object in his mind, as for example, to build a church at W., and that purpose cannot be answered, the next kin will take. 2 Story's Equity, 424; 2 Co. Rep. 364, 865; 4 Vesey, 419, 433, 434, note; Jeremy on Equity, Juris. B. ch. 1 sec. 2, p. 243, 244, 245. So if a fund should be given in trust, to apply the income to printing and promoting the doctrines of the supremacy of the pope in ecclesiastical affairs in England, the trust would be held void on grounds of public policy; and the property would go to the personal representatives of the party creating the trust; and would not be liable to be applied to other charities by the crown, because it was not intended to be a general trust for charities. 2 Story's Equity, 424; 5 Russ. Rep. 228.

And such was the doctrine of Judge Marshall, in the case of the Baptist Association *v.* Hart's Executors, 4 Wheat. 27: and of Judge Story, in the same case, reported in 3 Peters, 482.

The jurisdiction exercised by the English chancellors in executing a general devise for charities, which was void at law, in a

different manner, was solely by virtue of the statute of 43 Elizabeth, or as inforcing the prerogative of the king, as *parens patriæ*, before the statute, and formed no part of the jurisdiction of the court of chancery, as a court of equity. In reviewing Porter's case, 1 Co. Rept. 22, Chief Justice Marshall says, in substance, that it is impossible to resist the conviction that chancery, previous to the statute of 43 Elizabeth, could afford no relief to the *cestui que trust* in a devise, as a charity which was void at law; 4 Wheaton, 35: and *that the* original interference of chancery in charities, when the *cestui que use* had not a vested interest, was founded on the statute of Elizabeth, and still depends on it. Ibid, 36 and 39. Judge Story, in the same case, remarks, that the jurisdiction of chancery over charities, when no trust is interposed, or there is no person in *esse* capable of taking, or when the charity is of an indefinite nature, rests upon the provisions of the statute of Elizabeth. 3 Peters, 497; Ibid, 494.

Such were the conclusions arrived at by judges Marshall and Story, after a full review of all the English cases in 4 Wheaton, 27, 50; and 3 Peters, 482, 503; and there is no pretence that the statute of Elizabeth ever was in force in this country.

If, however, there were grounds for such a presumption, the Revised Code, page 8, sec. 8, repeals all statutes, acts, and parts of acts, of a public and general nature, not published in the Revised Code; and the statute of 43 Elizabeth was not so published.

Yet the argument of the counsel for the appellees, on this branch of the question, seems to be based entirely upon the authority of the statute of Elizabeth, and the numerous decisions under that statute, as affording evidence of the common law. Indeed, they say in their printed brief, in express terms,

"That the statute of Elizabeth, for the regulation of charitable uses, must be regarded as declaratory of the common law, and only intended to limit and control the operations of the statute of mortmain." To such a construction of the statute of 43d Elizabeth, we cannot consent, and it has never been so considered by any author or judicial decision with which we have any acquaintance, although some decisions or dicta may be found which, in some particular, so consider it. But, upon the contrary, we be-

lieve that it has ever been considered as giving rights and powers and as affording remedies which did not exist at common law prior to the statute.

The jurisdiction exercised by the chancellor under the statute of 43d Elizabeth, chap. 4, over charitable uses, is held to be personal in him, and not exercised in virtue of his ordinary or his extraordinary jurisdiction in chancery: according to the authority of Judge Story, in the 2d vol. of his Eq. p. 431.

In the case of the Baptist Association *v.* Hart's Ex'ors, previously referred to, 4 Wheat. 37, Judge Marshall says:

"There seem to have been two motives for enacting the statute: the first, and greatest, was to give a direct remedy to the party aggrieved, who, when the trust was vague, had no certain and safe remedy for the injury sustained, who might have been completely defeated by any compromise between the heir of the *feoffer* and the trustee; and who had no means of compelling the heir to perform the trust, should he enter for the condition broken. The second, to remove the doubts which existed, whether these charitable donations were included within the previous prohibitory statute."

We have no trace, says Judge Marshall, in any book, of an attempt, in the court of chancery, at any time anterior to the statute, to enforce one of these vague bequests to charitable uses. But we have reports of decisions at common law, which notice points referred by the chancellor to the judges. Immediately after the passage of the statute, we find that questions, on the validity of wills containing charitable bequests, were propounded to and decided by the law judges.

Collison's case was decided in the 15th of James I., only seventeen years after the passage of the act, and the devise was declared to be void at law, but good under the statute. Two years prior to this, Griffith Flood's case, reported in Hobart, was propounded by the court of wards to the judges; and in that case, too, it was decided that the will was void at law, but good under the statute.

Had the court of chancery taken cognizance, before the statute, of devises and bequests to charitable uses, which were void at law, similar questions must have arisen, and would have been

referred to the courts of law, whose decisions on them would be found in the old reports.

Had it been settled before the statute that such devises were good, because the use was charitable, these questions could not have arisen afterwards; or, had they arisen, would have been differently treated.

Judge Marshall, in the same case, p. 39, says, that the earliest decisions we have trace the peculiar law of charities to the statute of Elizabeth, and that nothing is to be found in our books to justify the opinion that courts of chancery, in the exercise of their ordinary jurisdiction, sustained, anterior to that statute, bequests for charitable uses, which would have been void on principles applicable to other trusts, and that the practice of filing an information in the name of the attorney general, if, indeed, such a practice existed in those early times, might very well grow out of the prerogative of the crown, and would by no means prove that prior to the statute the law respecting charities was what it has been since; and we have the testimony of Judge Story to the same point, after an elaborate review of all the English cases, in 3 Peters, 493.

Our constitution, (Judicial Department, articles 1 and 16,) in conferring jurisdiction on the court of chancery, uses the term equity. But on this point there can be no question in an American court; nor could there be in England, under such devises and policy as ours.

The devises, therefore, being void, the heirs take, notwithstanding, says Kent, that the testator may have clearly declared his intention to disinherit them. 4 Kent, 510. The estate in such case must descend to the heirs, if it be not legally vested elsewhere. Cowp. Rep. 657; 7 Cow. 187; 2 Wendall, 1; 6 Conn. Rep. 292. The Rev. Code, p. 40, secs. 50 and 52, however, is thought to be conclusive on this point.

Whenever, therefore, the intention is to create a trust, which cannot be disposed of, the property reverts to the heirs at law, or next of kin. 3 Amer. Dig. 538.

In the discussion of the case of Jane B. Ross *et al. v.* Duncan & Butler, we propose to establish:

1. That the devise by the testatrix of her slaves, and her plan-

tation called Ridges, to her executors, in secret trust and confidence that they would transport the slaves to Africa, for the purpose of effecting their emancipation, and sell and dispose of the plantation to defray the expense and provide for said slaves two years in Africa, was in fraud of the policy and laws of the state, and void, and that the trust in confidence for such purposes cannot be executed by the executors.

II. That the devises of the plantation and slaves to the executors, was in secret trust for the benefit of the slaves, who cannot take by devise, and are absolutely void, and the *cestui que trust* still remain slaves by the laws of the state.

III. That the said devise of the plantation and negroes in secret trust and confidence being a premeditated fraud upon the laws of the state to avoid her policy, and the residuary devise to the executors, being a compensation to them, and upon condition that they would execute the will, are both void, and descend to the heirs at law.

IV. That it is competent to prove said secret trusts or devises in confidence as charged in the bill, by parol, and other extrinsic evidence.

1. Whether a gift or legacy upon trust or in confidence that the donee or legatee would hand it over to one by law incompetent to take, is very particularly considered by Pothier, and denied to be, in conscience, an effective and binding trust. 1 Traite des Donationes Partie, chap. 2, act 3. 2 Fonblanque's Equity, 348. The law will not permit secret agreements to evade what upon grounds of public policy is established. 6 Vesey, 69. Lord Eldon says, the policy of the law requires, that courts of justice should distinctly state that it is incorrect conduct in both parties, both in him who projects such a trust or purpose, and in him who carries it into execution. 6 Vesey, 52, 58, 66-7-8-9, in point. 9 Vesey, 516, is in like manner similar to the case under consideration, being a bill by The Heir *v.* The Devisee, alleging that a devise was upon a secret trust or undertaking for charitable purposes. It would be singular, says Lord Eldon in the decision of that case, if the court would protect individuals, and would not act to prevent a fraud upon the law itself. 9 Vesey, 519. Numerous however, are the examples that might be adduced to illustrate the doc-

trine of equity in setting aside agreements and acts in fraud of the policy of the law. 1 Story's Eq. 594. The reason is, that the public interest requires that relief should be given, and it is given to the public through the party. 1 Story's Eq. 297. Constructive frauds, says Judge Story, are so denominated on account of their being contrary to some general public policy, or fixed artificial policy of the law. By being contrary to public policy we are to understand, that in the sense of the law they are injurious to or subversive of the public interest, by attempting to do indirectly, what the law has prohibited directly. 1 Story's Equity, 262, sec. 260. Newland on Contracts, chap. 33, page 469. By the seventy-fifth section of the Revised Code, p. 385, it is declared that it shall not be lawful for any person being the owner of slaves to emancipate them by last will and testament or otherwise, unless it is proven to the satisfaction of the general assembly that such slave or slaves hath done and performed some meritorious act for the benefit of the owner, or some distinguished service for the benefit of the state; and without the sanction of the legislature, the act of emancipation is void. Such is the policy of the laws of this state, evidenced by the above recited act; and furnishes conclusive evidence to the court, not only of the law but of the public policy of the state. An instrument of emancipation must conform to the laws of the country where the emancipator was domiciled, or it is void; and such is the principle settled in 1 Randolph, 23–4; Story's Conflict of Laws, 215–16–17–18–19; and the case in 6 Randolph, shows that an attempt to emancipate contrary to the laws in force at the time, is void, although a trust was created to support it, as in the present case. No state is under any obligation to give effect to any acts of parties which contravene its own policy and laws. 2 Story's Eq. 429. Story's Conflict of Laws, sec. 98, page 106, says, that no state will suffer its own citizens to evade the operation of its own fundamental policy or laws, or to commit frauds in violation of them. As the testatrix, Mrs. Reed, could not by the laws of this state, free her slaves in Mississippi, she attempted to do it indirectly, by devising them in trust or confidence to her executors, to transport to Africa for the purpose of colonizing them there, which being in fraud of

the policy and laws of the state, were void devises, and the slaves and plantation descend to the heirs.

Personal property is undoubtedly subject to that law, in point of distribution, which governs the owner, that is, to the law of the country in which the owner is domiciled : real property, to the " *lex loci rei sitæ,*" 2 Kent, 344; 2 Bos. & Pul. 229; 3 Ves. 198 ; 5 Ib. 750; 3 Cranch, 319; 1 Binney, 336; 3 Johnson's Ch. Rep. 210 ; 1 Mason, 408 ; 4 Greenleaf, 134. Otherwise to allow the testator, says Kent, to interfere with the established rules of law, would be to permit every man to make a law for himself, and thus disturb the metes and bounds of property, 4 Kent, 520.

The object of the devise to the executors, being in confidence that they would transport the slaves to Africa to be colonized as free persons, to avoid the laws and policy of this state, and sell, and dispose of the plantation for their benefit, is void, and the executors cannot transport them to Africa in derogation of the rights of the heirs, which have become vested, and thereby contravene the whole policy of the state, 2 Story's Equity, 429; 3 Peters, 497–498. Thus where a legacy was given in England, in trust for certain nunneries in foreign countries, it was held void, 4 Ves. 434, (note); and in like manner, when a pecuniary legacy was given for such purposes as the superior of a foreign convent should judge expedient, it was held void, 6 Vesey, 567. The bequests in both cases being for Roman Catholic establishments, which was against the policy and laws of England.

That a deed, says C. J. Boyle, or other instrument, purporting on its face to do an act that is prohibited by law, cannot be valid, nor constitute a medium through which a right can be decreed, is a proposition too evident to admit of controversy. The end being interdicted, the means for its accomplishment must be considered illegal and void, 2 Bibb, 58. It is evident that the executors themselves cannot take the property, because it was devised to them in confidence, that they would carry out the design of the testatrix, by freeing and colonizing the slaves in Africa, and dispose of the real estate to defray the expense of transportation, and provide for them two years in Liberia. The executors therefore must receive it upon that condition, or they cannot receive it upon any. To attempt to hold it individually, would be a fraud upon

the law, a fraud upon the testatrix, a fraud upon the heirs, a fraud upon the slaves themselves, and violate every known principle of law; and it is believed that they never intended it.

In the case of Strickland *v.* Aldridge, Lord Eldon fully sustains this principle, 9 Vesey, 519. Also in the case of Muckleston *v.* Brown, 6 Vesey, 52; and in Corbyn *v.* French, 4 Vesey, 419, Lord Eldon maintained the same doctrine. Judge Story, in his Equity, 2 vol. 427, says, that if the testator means to create a trust, and the trust is not effectually created or fails, the next of kin must take. On the other hand, if the party selected to make the distribution is to take it, it must be upon the ground that the testator did not intend to create a trust, but to leave it entirely to the discretion of the party to apply the fund or not. The latter position, says Judge Story, is repugnant to the very purposes of the bequest, and therefore the interpretation is, that it is the case of a frustrated and void trust, 2 Story's Equity, 428; 1 Turn. & Russ. 260–270. But nothing, I apprehend, is more familiar than the doctrine in relation to contracts : and it is laid down that he who takes by devise takes by purchase. If the executors intended to claim the property devised to them in confidence, individually as their own, they ought to have disabused the confidence of the testatrix by letting her know that they would not execute the trust. It is an ancient and well settled principle, that whenever *suppressio veri, or suggestio falsi* occur, they afford sufficient ground to set aside any conveyance or release, 13 Peters, 36. The same principle is also expressed with sententious brevity by Judge Story, in 1 Story's Equity, 201–2. Hence it follows, that at the death of the testatrix, her negroes and land were undevised to any devisee who could legally take : and it is equally clear that they were slaves by the laws of the state at the death of Mrs. Reed, and being not otherwise legally disposed of, vested immediately in the next of kin. 4 Wheaton, 28, and Rev. Code, p. 41, 42, sec. 50 and 52, are conclusive on this subject.

Nothing is thought to be more incorrect, both in theory and in practice, than the idea that the devises in the present case are directed to be executed in a foreign country, and as regards the laws and policy of this state, *extra territorium :* consequently that they can be legally executed. The principle is well settled,

that when the object of a devise is to be executed in a foreign country, it must not be against the public policy of the laws of the state where it is sought to be enforced, or the courts will declare it void. 2 Story's Equity, 429; 6 Vesey, 567; De Phemines *v.* De Boureval, 5 Russ. 292, 297. The persons who are named to execute the devises in the present case, reside in this state, and there is no person or persons named in the foreign country to execute them.

2d. The devises of the plantation and slaves in secret trust or confidence to the executors, was for the benefit of the slaves themselves, being indirectly a devise of their freedom, and the plantation in trust for them. That slaves cannot take either by devise, descent, or purchase, has been settled by the High Court of Errors and Appeals of this state, in the case of Thomas Hinds *v.* Henry Brazeale *et al.* 2 Howard, 836; and John W. Vick *v.* John H. McDaniel, 3 Howard, 337; and such is the weight of authority in the other states, 3 Amer. Dig. 479. A devise for the maintenance of slaves, is void.

In the case of Bynum *v.* Boswich, 4 Desauss. 260, the court decided, that a bequest of slaves to a trustee, with directions to liberate them, was void, being in opposition to the provisions of an act of South Carolina, which forbids emancipation in any other way than by deed executed in the lifetime of the master, a certain time before his death, and in a particular form. And in Cunningham *v.* Cunningham, 1 Taylor, 209, the court decided that a devise for the maintenance of slaves was void, 3 Amer. Dig. 480; and in Haywood *v.* McCraven, 2 Carolina Law Repository, 557, 3 Amer. Dig. 538, where the testator bequeathed to his executors, after the death of his sister, his slaves in trust to have them set free, and also devised to his executors real and personal estate for the use of his slaves: it was held void by the court, as being contrary to the policy of the law, and that wherever the intention was to create a trust that could not be disposed of, the property reverted to the heirs at law or next of kin; and that a devise of land, to be rented out for the maintenance of slaves was void also. 3 American Digest, 479. In the case of Moses *v.* Denigree, 6 Randolph, 561, and 3 Amer. Dig. 499, it was decided that a deed of emancipation executed in 1781, (at which time emancipation

52*

was not permitted except in certain cases) although it directed the emancipation to commence when the slaves should come of age in 1796, was absolutely void, notwithstanding the law had been so changed in the mean time as to admit of emancipation.   If the slaves had been manumitted conditionally to have their freedom when the laws would permit, it seems it would have been good ; and such is the case in 2 Call. 319, cited by the appellees.   No authority can be found to authorize a slave to take by devise, descent, or purchase, or to be a *cestui que trust.*

It is a universal and undoubted maxim in law, that a legacy must vest and take effect at the death of the testator, or be void at that time, and the right vest in another.   3 Peters, 497; Ambler 636, 640.   In whom then did Mrs. Reed's slaves vest at the time of her death? for if they did not legally vest elsewhere, they descend to the heirs at law.   They could not vest in the executors individually in their own right, because they were devised to them in trust, and they must execute the trust or they descend to the heirs.   2 Story's Eq. 427.   They could not vest in the executors as trustees, because those for whose use they were devised, were, at the death of Mrs. Reed, and still are, slaves themselves; and a trust for one in law incapable of taking is void.   2 Fonblanque, 326;  6 Ves. 52, 64.

These principles are incontrovertible, and settle the whole question involved in this case :

1st.  No person can deny that the one hundred and twenty-three negroes were slaves at the death of Mrs. Reed, and still remain so by the laws of this state.

2d.  No person can contend that they vested in the executors in fee : and

3d.  No person can contend that they vested in the executors as trustees for the slaves themselves, because slaves cannot be *cestui que trust*, nor take by devise.   In whom then did they vest? The conclusion is irresistible and the principle immutable, that such a devise, at the death of Mrs. Reed, was void, and that the slaves descend to the heirs.

These principles, passed over by the chancellor *sub silentio,* are thought to destroy the whole basis and fabric of his opinion.   He says in his opinion, in substance, that Mrs. Reed could, while liv-

ing, have sent her slaves to Africa, and that no one had a right to question it. He then draws the conclusion, that whatever would have been a legal disposition of property by a person while living, would be equally lawful when disposed of by will. Such a conclusion is a *non sequitur*, and violates the best settled maxims of the law. The 75th section of the Revised Code, 385, has reference solely to the owner or owners of slaves while living, acting in *propria persona*, and not to the executors or trustees. With the owner dies the power to emancipate, even for meritorious or distinguished services; and although Mrs. Reed might have sent her slaves to Africa while living, yet she did not do so, but died, leaving them in the state, and slaves by the laws of the state.

The principle, then, that personal property, in point of distribution, is governed by the law of the country where the owner was domiciled, is unquestioned: and the principle, that a devise legally vests at the death of the testator, or is void and descends to the heirs, is also unquestioned. Mrs. Reed's slaves, as before remarked, could not vest, at her death, in her executors; because they were devised to them in trust, for the benefit of the slaves. Neither could they vest in them as trustees, because the *cestui que trust* were slaves, and could not take. How then does it follow, that the executors can do whatever Mrs. Reed might have done? The law shows most clearly that the rights of property have been changed, and a different set of principles apply, and that the executors cannot do what Mrs. Reed could have done while living. This change of being, from the living to the dead, and consequent change of principles that attach, also destroy the other conclusions drawn by the chancellor in his opinion, to wit: That the legislature intended the prohibition to emancipate to extend only to cases in the state where the slaves were to remain, and that Mississippi has nothing to do with the emancipation of slaves elsewhere, and does not assume police jurisdiction beyond her own limits; that it was difficult to perceive how an act done in Liberia, according to its laws, could violate the laws of this state. It is sufficient to answer all these conclusions by a reference to the foregoing principles, and that the slaves are the slaves of a dead person, found in the state and subject to her

laws, and that by those laws, and the universal maxims of the common law, the rights of the heirs attach and become vested, whilst the negroes are still slaves, and within the state, and subject to her laws.

And although it might have been difficult (as supposed by the chancellor,) to perceive how an act done in Liberia, according to its laws, could involve a violation of the laws of this state, yet when the act is done in this state the perception is clear. If the slaves of Mrs. Reed are entitled *to their* freedom, it is by virtue of her last will and testament, executed in the state, by one domiciled and subject to her laws. If the will is a valid instrument, it derives its validity from the laws of Mississippi. The right, therefore, to freedom, has become vested by the laws of the state, and Mrs. Reed has succeeded in freeing her slaves by last will and testament, in the state of Mississippi, according to the process of reasoning adopted by the chancellor, notwithstanding the law says, that no person shall, by last will and testament, emancipate, &c. Can such things be? Can pure water thus be drawn from an impure fountain? The germs of freedom, according to such superficial reasoning, have been sown in Mississippi and nurtured by her policy and laws. If the slaves have not been legally emancipated by the last will and testament of Mrs. Reed, under the laws of the state, they constitute property, and not having been devised to the executors in their own right, must descend to the heirs.

You cannot, according to the well settled maxims of law, do indirectly what the law has prohibited directly; and the law certainly has directly prohibited emancipation by last will and testament, except for meritorious or distinguished services, to be approved and sanctioned by the legislature.

But again, it is conceived that the chancellor has mistaken the rule of law, in saying, that the right to dispose of property by will, is as broad and comprehensive as the right of disposition while living; and that whatever would be a legal disposition of a person's property while living, would be equally lawful when disposed of by last will and testament. A few examples will illustrate this error. For instance, a man may convey, *bona fide*, all his personal property, while living, without any provision

for his wife. Yet if he does it by last will and testament, it is void so far as the dower of the wife is concerned. Again: he may convey, *bona fide*, while living, all his estate, without providing for his creditors; yet if he does it by will, it is void so far as it regards the rights of creditors. In fine, it is thought that there is no analogy between the two powers of disposition. Again: it is said, both by the chancellor and by the counsel for the appellees, that the law prohibiting emancipation, applies only to cases where the freedom is to take place in the state, and not to cases where it is directed to take place in another country, and that in such case it violates neither the laws nor the policy of the state. If the freedom of slaves, owned and domiciled in Mississippi, takes place by virtue of a will executed in the state, and the laws of the state prohibit emancipation by will, it would be strange indeed if it did not violate those laws, although the freedom was to be enjoyed in another country: and still more strange would be the anomaly, if it did not violate her policy.

The principle here laid down by the chancellor, and by the counsel for the appellees, if true, would destroy the law as a science, which is said to be the perfection of human reason. But, alas! how imperfect must be the code of human reason if an act, prohibited by law, can be committed with impunity by a citizen amenable to the law; and the validity of the act prohibited by law, be upheld by the violated law itself. For the validity of the devises must unquestionably, and beyond all doubt, be tested by the laws of Mississippi, and within the state, where they have full force and operation, and that, too, without regard to other countries, or the laws of other countries, with which the courts of this state have nothing to do.

Slaves constitute a portion of the vested wealth and taxable property of the state. Without them her lands are worthless. Would it not therefore be contrary to the policy of the state, to part with this vested wealth, this source of revenue, with that which alone renders her soil valuable.

Again, would it not be productive of mischief, and would it not be spreading a dangerous influence among the slave population of the country, for the slaves of the whole plantations to acquire their freedom, take leave of the country and make their departure,

proclaiming liberty for themselves and their posterity ?   Would this not render the other slaves of the country dissatisfied, refractory, and rebellious ?   Would it not lead to insubordination and insurrection ?   And if so, would it not be contrary to the policy of the law ?   So certain as the heavens afford indications of the coming storm, so certain will scenes of blood be the concomitants of such testamentary dispositions in this state.   And yet it is said that the colony of Liberia is an object worthy of all philanthropic encouragement.   What ! that germ whence spring the elements of discord and dissatisfaction among the slaves of the country— that nucleus that fosters insubordination and leads to insurrection —that institution from which reverend agents thrust themselves among the slave population of the country, and proclaim the advantages and blessings of Liberia; for it is charged in the bill that some such persons visited Mrs. Reed.   Such a colony may indeed be an object worthy of all commendation and encouragement to some persons, but it can never be so, to the peaceable citizens of a slave-holding state.

Slavery, as it exists in this country, did not exist at common law, and therefore the right to emancipate at common law has no application.

3. That the devises being void, the heirs take, says Kent, notwithstanding the testator may have clearly declared his intention to disinherit them.   4 Kent, 610.   The estate in such case must descend to the heirs, if it be not legally vested elsewhere.   Cowper's Reports, 657 ;  7 Cowen, 187 ;  2 Wendell, 1 ;  6 Cowen, 292. The Revised Code, p. 40, sec. 50 and 52, however, is thought to be conclusive on this subject.   Whenever the intention is to create a trust which cannot be disposed of, the property reverts to the heirs at law or next of kin.   3 Amer. Dig. 538.

4. That it is competent to prove said secret trust or devises in confidence, as charged in the bill, by parol or other extrinsic evidence, is a proposition too clear to admit of doubt.   But it cannot be denied nor disguised, that the letter marked exhibit D., constitutes the will of the testatrix; in other words, that it is a paper signed by the testatrix at the same time of executing the will and delivered to the executors, declaring the trust; and we are bound to look upon the letter as the genuine will, which requires no

further proof. One proposition may be received as a standing rule, that any thing in writing decisively marking the intention to create a trust, will be effectual without a formal declaration, either as a virtual declaration to satisfy the statute, or as the implication of a trust upon grounds of equitable construction to put the case within the exception; to which we may add that although the principal instrument be without either expression or implication of a trust, yet a precedent, subsequent, or accompanying instrument, may make the trust manifest, though itself no formal declaration. Roberts on Fraud, 95; Barnell *v.* Joy, 16 Mass. 221; Roberts on Fraud, 101. In the case of Primmer *v.* Bayne, 7 Ves. 518, Lord Eldon says, that the sum and substance of all the authorities, is, that all parol declarations, whether made before, at, or after the making of the will, were alike admissible to rebut the presumptions, though they are not all alike weighty and efficacious; whether they consist of conversations with people who have nothing to do with the question of declarations provoked by impertinent inquiries, or in whatever form they may arise, they are all evidence, though entitled to very different credit and weight, according to the times and circumstances. Roberts on Fraud, 71, 72. A voluntary acknowledgment of trust will dispense with the written proof, and equity has compelled the acknowledgment of a trust by parol, though the statute of fraud was relied on. Chan. Dig. 490; 1 McCord, 119. In chancery, parol or extrinsic evidence is admissible to prove fraud or to correct mistakes. 1 Johnson's Chan. Rep. 594; 1 Day, 139; 1 Bay, 247; 3 Hen. and Mun. 144, 288; 2 Johns. Chan. Rep. 274, 585. When fraud is alleged in the bill, and the evidence goes to establish it, the statute of frauds is very properly put out of the question, since the object of the evidence is not to contradict the instrument, but to raise an equity *dehors* the instrument in contravention of a purpose, which no law or statute will be suffered to assist or protect. Roberts on Frauds, 80; 1 Atkyns, 447. Any declaration in writing made by the grantee or assignee of property, at any time after the conveyance, is competent proof that the property is held in trust; and letters or other papers, however informal, are sufficient to constitute such declaration. 4 Amer. Dig. 291; 16 Mass. 221. The objection that a trust cannot legally exist without a declaration in

writing, signed by the party who holds the legal estate, does not apply to secret trusts and confidences, enacted for the purpose of defeating or delaying creditors, which may always be proved by parol, and when so proved, render wholly inoperative the formal transactions which have been adopted for such purposes by the parties. 4 Amer. Dig. 549, 551; 12 Mass. 26; Walker's Rep. 197; 3 Am. Chan. Dig. 402.

By a short review of the principal authorities cited by the appellees, it will be found that they have little or no bearing on the case under consideration. The case of McCutchen *et al. v.* Marshall *et al.*, referred to in 8 Peters, 220, is thought to have no relation whatever to the case before the court. By the act of North Carolina, of 1777, chapter 6, section 2, which was in force in Tennessee, no negro could be set free except for meritorious services, to be adjudged of and allowed by the court. The act of Tennessee of 1801, chap. 27, sec. 1, modified the former laws and allowed the owner of slaves to petition the county court in all cases, setting forth the intention and motive for such emancipation, without any restriction as to meritorious services. 8 Peters, 238. The act of 1829, chap. 29, makes it the duty of an executor or administrator, with the will annexed, when a testator had by his will directed slaves to be set free, to petition the county court accordingly; and if the executor and administrator failed or refused to do so, the slaves are authorized to file a bill for their freedom in chancery. 8 Peters, 240. The county court was authorized to allow the emancipation; full jurisdiction was given to the court; the court allowed the emancipation; and, say the court, the laws of Tennessee fully authorize the emancipation of slaves in the manner provided by the will of Patrick McCutchen.

If the laws of Tennessee sanctioned the mode, who had a right to complain? Our statute prohibits emancipation except for distinguished or meritorious services, and reserves the right of judging of such services to the legislature only.

The case of Fisher *v.* Dobbs, 6 Yerger, 119, is much relied on by the appellees, as being in point, because the court refused to emancipate without requiring bond and security that the emancipated slaves should not only be sent out of the state, but out of the United States, to wit: to Africa.

The act of Tennessee of 1831, c. 52, required slaves upon being emancipated, to be removed beyond the limits of the state: and the court in their decision went further, and required them to be sent out of the United States, to wit: to Africa. It would be difficult to perceive upon what principle this Tennessee case could apply to the one under consideration. The acts of the legislature of that state, authorized the court, on petition, to emancipate without restriction, and leaves the question to the discretion of the court. There is no analogy between the statutes of Tennessee and Mississippi. Our statute prohibits emancipation under all circumstances, except for distinguished or meritorious services, and reserves the right of judging of the service to the legislature.

The case of Blackman & Hadley *v.* Negro Phil, 7 Yerger, 452, is another barren decision under the Tennessee statute; and it would be hard to perceive what bearing it could have upon the present case. Phil had been sold by Hadley, and conveyed by bill of sale and delivered to Latimon, in Tennessee, who afterwards took him to Illinois, and there, being the owner of Phil, emancipated him. Phil afterwards returned to Tennessee, and long afterwards, and after the death of Hadley, his former owner, Hadley's representatives seized on Phil as a slave, and the court decided that by the deed of emancipation in Illinois, Phil acquired his freedom.

The case referred to in 1 Bibb, 422, is another reference in which we are unable to perceive the bearing. It was on a special contract for freedom according to the laws of Kentucky, proved, say the court, beyond a doubt: and the court said, " the contract in itself was not forbidden by any political institution, but was in unison with the dictates of natural rights." 1 Bibb, 424.

The case of Pleasants *v.* Pleasants, cited by the appellees in 2 Call, 319 and 357, and in the Law of Slavery, 314, in like manner has little or no perceptible bearing on the question before the court. It was a devise by the testator, of his slaves to his son, on condition that he allowed them to be free at the age of thirty years, if the laws of the land would admit of it: and the court held that the limitations were good, in the event of such a law being passed, while the slaves remained in the family. The case is reviewed in 6 Randolph, 561, where the court say, that in the

case of Pleasants *v.* Pleasants, the court carried the law far enough, although it violated no statute : and that a deed of emancipation of slaves executed in 1781, declaring the slaves free when they should arrive at full age, which would be in 1796, was void by the act of 1723, notwithstanding that previous to 1796, the law had been changed so as to admit of emancipation. Law of Slavery, 311.

The will in case of McCall, say the court, merely directed that the slaves should have their freedom whenever the laws would permit it, and created a trust to support the devise. How very different to the present case ? and consequently no authority.

The case of Rush's representatives *v.* White and wife, 3 Monroe, 104, is another reference to an authority by the appellees which settles no point involved in the present case. It was the case of a slave having gone to reside in the North Western Territory, now state of Ohio, with the consent of the owner. By the laws of Kentucky, and an act of 1800, slaves may be emancipated by an instrument in writing not under seal, made by a master eighteen years of age, without any restriction whatever.

The case of Hunter *v.* Pulcher, 1 Lee, 172, cited by the appellees, was tried in Virginia, under the laws of Maryland, which enacts, that it shall not be lawful to bring a slave into the state, either for sale or residence : and that a slave brought in contrary to the act shall be free, 5 Randolph, 131. It appeared in evidence, that the master took his slave from Virginia to Maryland, and resided there with him for twelve years, and then returned to Virginia, when the court adjudged him to be free under the laws of Maryland. Law of Slavery, 329.

Of such like character, are all the authorities referred to by the appellees, not one of which is thought to have any bearing on the case under consideration.

The question before the court is by no means a novel one in this state. In the case of Brazeale *v.* Hinds, 2 Howard, 836, the court decided that "no owner can emancipate his slave but by a deed or will properly attested or acknowledged in court, and proof to the legislature that such slave had performed some meritorious act for the benefit of the master, or some distinguished service for the state; and that the deed or will could have no

validity until ratified by a special act of the legislature. It is believed that this law and policy are too essentially important to the interests of our citizens to permit them to be evaded."

To the foregoing opinion, delivered by the chief justice, he further adds: "John Monroe, being a slave, cannot take the property as a devisee, and I apprehend it is equally clear it cannot be held in trust for him." 4 Des. Rep. 266.

Thus we find the rule broadly laid down by the chief justice, which covers the whole ground involved in the case before the court. View it as you may, turn it as you will, twist it as you please, still in principle it covers the sole and only question before the court. That opinion was a just exposition of the laws and policy of the state, and must stand the test of scrutiny and of time; a beacon, pointing to a just interpretation of the laws and policy of the state, on the subject of domestic slavery.

The case of Vick's Executors *v.* McDaniel, 3 How. 337, was in point. In that case the testator, by his will, directed the executors to transport his slaves to the states of Ohio or Indiana, (a country, foreign as regards this state,) there to reside free from slavery, which will appear by a reference to the bill and original papers; and the court adjudged the devise contrary to the law and policy of the state.

The question principally mooted in the case was, whether the slaves should belong to the residuary devisee or descend to the heirs at law. Justice Trotter, in delivering the opinion of the court, uses the following emphatic language: "It is evident that the testator did not intend that the slaves in question should belong either to the heirs or to the residuary devisees. He intended that they should be emancipated. That intention is defeated by the operation of our fundamental law, and the settled policy of the state." See 3 How. 341.

This decision again covers the whole ground involved in the cases under consideration. If a devise of slaves, to be transported to the state of Ohio, (foreign to this,) for the purpose of effecting their emancipation, is defeated by the operation of our fundamental law and the settled policy of the state, why is a devise of slaves to be transported to Liberia, for the purpose of effecting their emancipation, not also defeated by the law and policy of the state?

And if not so defeated, then what is the distance, in miles and furlongs, to which slaves may be transported, and which will or will not be so defeated? The truth is, that distance has nothing to do with the question, and the principle is the same, whether they be transported to the opposite bank of the Ohio river or to the coast of Africa.

These decisions, in principle, certainly do settle the question before the court, and furnish an exposition of the laws and policy of the state, upon which there can be no two opinions, and from which it is conceived that even the appellate court is not at liberty to depart. 1 vol. Story's Cons. Law, 350.

There was also another decision, in chancery, in point, and submitted to without an appeal, in which the counsel on both sides must have considered the doctrine as settled, to wit: the case of the heirs of D. W. Brazeale *v.* D. W. Brazeale's Executors, being a bill filed for the same decree that we now ask, and which was granted. Brazeale, by his will, devised all his slaves in trust to his executors, with directions to transport them to Africa, and colonize them in Liberia. The court of chancery decided that such a devise was against the laws and policy of this state, and void, and that the slaves descend to the heirs. That decree was made by one of the oldest judicial officers in the state, after taking it under advisement, and after mature deliberation; a man who settled in the country under the territorial government; who has digested the laws of the territory; filled the offices of legislator, circuit court judge, chief justice of the supreme court, and chancellor of the state; familiar with the legislation of the country, and the policy of the law and state. He decided that a devise of slaves to executors, with directions to colonize them in Liberia, was against the laws and policy of the state, and void.

The present supreme court have decided as much; and the whole state with some exceptions, is interested in a similar decision ; a decision [that will maintain and uphold the law and policy of the state. Our future prosperity as a sovereign people, depends upon it. It has been an attempt to commit a pious fraud on our laws and policy, by one who owed them obedience, and to substitute foreign principles in lieu of them, on the subject of domestic slavery. Let the decree of the present chancellor be

affirmed, and very soon another and yet another attempt upon our policy and laws will be made.

HOLT, on the same side.

PRENTISS, for appellees.

Two prominent points are presented by the record, to which all the others are collateral:

1. Is the provision of the will directing the transportation to Africa of such of testator's slaves as should choose to go, illegal, and will the court interfere to prevent its execution?

2. Upon the failure of such a disposition, is the residuary bequest to the Colonization Society, in trust, for the establishment of a seminary of learning in Liberia, illegal, and will the court interfere to prevent and prohibit the execution of such a trust?

These two questions, it is believed, involve the whole controversy. We will proceed to examine them in the order in which they arise.

First, then, is the provision for the transportation of testator's slaves to Africa, and their maintenance there in freedom, in contravention of the laws of Mississippi? It is averred by appellants, in their bill, to be in violation of an express statute, as well as in contravention of the cherished policy of the state on the subject of domestic slavery; that the slaves when sent to Africa will be free; that the will, therefore, is, in effect, a will for manumission, and by consequence, an evasion of and fraud upon the law.

We will first examine whether the disposition made of his slaves by the testator would be good, provided no law of the state prohibited the same.

The disposition of property by last will and testament has its origin in the earliest period of history. It has ever been a cherished principle of the common law to carry into effect those intentions in relation to the disposition of property, "which a man wills to be performed after his death." This dominion over property after death, is indulged until it comes in collision with great principles of public policy. It may be safely laid down as an incontrovertible proposition, that a person may, unless prohibited

53*

by law, direct in his will any disposition of his property, after his death, which he could have legally made during his life-time.

Our own statute on the subject of last will and testaments gives this power in the broadest terms. *Vide* Rev. Code, p. 32, sec. 14. It cannot for a moment be contended, that without an express law prohibiting it, (and even such a law would be unconstitutional,) any person would not have the right to carry or send any portion of his personal property out of the state of Mississippi, to Africa or elsewhere, provided the rights of third persons were not infringed thereby. The owner could either take it himself, or employ an agent as trustee, to effectuate his intention, and would have an undoubted right to appropriate the proceeds of other property to the accomplishment of the object.

Is there any thing in the character of slave property which excludes it from the operation of this rule? Does the fact that slaves sent to Africa would cease to be property and become free, as averred in complainant's bill, limit the owner, and preclude him from making such disposition of them? We think not. The right of the master to manumit his slave is a natural attribute of the condition of slavery, subject, of course, to be limited and controlled, like all other rights, by the municipal regulations and policy of the country in which the institution exists. On this point see 8 Peters, 220; Cooper's Justinian, 416; Judge Catron's opinion, Law of Slavery, 301; 2 Call's Rep. 319, 357.

This right of manumission, when unrestrained by positive municipal regulations, has ever been held, in all countries where slavery has obtained, as one of the most valuable and important powers of the master. In the ancient governments, where the condition of slavery was more absolute than it is with us, (the power of the master extended even to the life of the slave,) the right to manumit was as much claimed and as highly esteemed as the right to sell and destroy. In all the states of the Union, where this institution has prevailed, the master has ever been allowed, in the absence of statutory limitations, to manumit at pleasure, by will, deed, or otherwise. In the absence, then, of any statutory provision, we take it as a clear point that Isaac Ross could, in his life time, have carried or sent his slaves to the coast of Africa, for the purpose of there freeing them, and could have

'appropriated the remainder of his estate, if he pleased, to their transportation and maintenance there. We think it is equally clear that he could, under such a state of facts, have legally directed, by his will, the same thing to have been done.

But we are met by the appellants with the position that this disposition of his slaves by Isaac Ross, however good it might have been at common law, is prohibited by an express statute, as well as by the cherished policy of the state. We will proceed to examine this position, for, if it be correct, the provisions of the will referred to cannot stand. The appellants rely upon the 75th section of the act entitled "an act to reduce into one the several acts concerning slaves, free negroes and mulattoes," passed June 18, 1822. Rev. Code, 385. This section provides that "it shall not be lawful for any person or persons, being the owner or owners of slaves, to emancipate them or any of them, unless by his or her last will and testament, or by any other instrument in writing, under his, her or their hand and seal, attested and proved in the manner required by law, by two credible witnesses, or the instrument of writing acknowledged by the party or parties, in the court of the county or corporation where he, she or they reside, and also prove, to the satisfaction of the general assembly, that such slave or slaves have done and performed some meritorious act for the benefit of such owner or owners, or some distinguished service for the benefit of the state, and the last will and testament or other instrument in writing, as aforesaid, shall not have validity until the same shall be sanctioned by an act of the general assembly, nor until the owner or owners shall have complied with the conditions which may be specified in such act."

We contend that this section is a mere municipal regulation, aiming simply at the internal police of the state, and prohibiting emancipation only within its limits. We deny that the emancipation which results from a removal of slaves to a foreign country is embraced within its letter or its spirit.

In the earlier history of the slaveholding states, the power of manumission was but little restricted by legislative enactments. But it soon became apparent that the frequent exercise of this power was productive of a great evil, by the rapid increase which it caused in the free negro population. This kind of population

was found, by experience, to be both oppressive and dangerous, constituting a heavy charge upon the public and a great nuisance to the community. It became, therefore, the necessary policy of these states to rid themselves of this evil, and, as far as practicable, to prevent its further extension. In pursuance of this policy, they proceeded, by various legislative enactments, to diminish the rights and increase the responsibilities of free negroes; and, as a branch and parcel of this system, have, most if not all of them, placed various restrictions, limitations and conditions upon the owners' right of manumission, which had been the prolific source of the mischief. It may be safely asserted that every such limitation or restriction of the right of manumission, was intended by the legislature only to relieve the state from the accumulation within its borders of an obnoxious free black population. All laws of this sort will be found to aim at this object alone; and to this extent, and no more, have they been enforced by the judicial tribunals.

That we are correct in our view of the object of the laws limiting manumission, will be apparent from an examination of the statute books of the different states.

All such limitations will be found incorporated with, and forming a part of, the police regulations of the several states, on the subject of slaves, free negroes and mulattoes, and not among the laws regulating the disposition of property. In many cases such limitations are preceded by a preamble, expressly reciting their object to be as we have contended. The law of Georgia upon this subject is a striking instance of this sort. How is it in our own state? Where do we find the provision above quoted? Not under the head of "last wills and testaments;" not under the title of "conveyances," nor connected with any law relating to the disposition of property. It is found in the seventy-fifth section of an act in which are embraced all the police regulations of the state in relation to slaves, free negroes and mulattoes. The principle that statutes *in pari materia* are to be construed together, is peculiarly applicable to this act. Its different sections and provisions are to be construed together, for they are manifestly *in pari materia*.

The act contains eighty-six sections, all of which (unless the

one under consideration be an exception,) are devoted to the police and municipal regulation of slaves, free negroes, and mulattoes. It seems to us clear, that the seventy-fifth section had the same, and no other object in view. There are provisions in the section itself which show that it referred only to manumission within the state.

First, it refers to the qualification of the slave to be emancipated. He must "have done and performed some meritorious act for the benefit of his owner or owners, or some distinguished service for the benefit of the state." Such slaves as could exhibit these meritorious claims were considered as exceptions from the general rule, that free negroes are vicious and dangerous, and were, therefore, left to the discretion of the legislature. This shows that the prohibition arose out of the character of the population produced by manumission. It ought not to be construed as extending beyond the object aimed at. Again; the section goes on to provide that "such last will and testament, or other instrument in writing as aforesaid, shall not have validity until the same shall be sanctioned by an act of the General Assembly, nor until the owner or owners shall have complied with the conditions which may be specified in such act."

The legislature could have no object in annexing conditions to emancipation out of the state. This provision manifestly contemplated only emancipation in the state, and was intended to provide for the requisition from the owner, of bond or other security, for the good behavior of the slave after emancipation, or that he should leave the state, or such other condition as would protect the state from the mischief aimed at by the previous portion of the section.

To illustrate our view of the nature and extent of this limitation of the right of manumission, let us turn to another law which is acknowledged to be a mere police regulation. It was enacted by the last legislature, that no person should thereafter sell liquor in less quantity than a gallon. Now all will acknowledge that this law prohibits such sale within the state only; and that it would not be a violation thereof to take the prohibited article into a foreign country, and there to sell the same in quantities less than a gallon. Now, would it be a violation of the "gallon law"

to devise a quantity of liquor in trust to be taken out of the state to a foreign country, for the same purpose? 'The principle is the same in both cases. The construction should be as if the section read, no owner shall emancipate in the state of Mississippi, except, &c., or no person shall sell in the state of Mississippi in less quantities, &c.

Our view of the matter is fortified by the decision of the High Court of Errors and Appeals in the case of Hinds *et al. v.* Brazeale *et al.* 2 How. Rep. 837. The court here consider the seventy-fifth section above recited, as a police regulation, intended to prevent the increase of free negroes in the state, and upon this point the decision turns. The deed in that case provided for taking the slave to Ohio, and there emancipating him for the express purpose of bringing him back into this state, here to reside as a free negro. The court did not decide that it was illegal to take a slave to Ohio for the purpose of emancipation there; but that the illegality arose from the provision for bringing back the slave into the state as a free negro, in fraud of the law, thereby producing the very evil which the law aimed to prevent. So far as this decision goes, it fortifies our view of the object and policy of the law. If that view be correct, then the provision in Isaac Ross's will, directing the transportation of his slaves to Africa, is in violation neither of its letter nor its spirit.

Sending slaves to a foreign country is not a violation of the letter of the law. If the slaves become free in such foreign country, by operation of its laws, such emancipation is not the act of the owner. It is not in violation of the spirit or policy of the law.

The spirit and policy of the law aim at a restriction of emancipation, merely for the purpose of preventing the mischief of a free negro population. Sending a slave to Africa, there to remain free, affects not this policy of the state of Mississippi. It is wholly immaterial to her whether a slave taken to Africa becomes free, or continues in the servile state. Her laws and policy on this subject look not beyond her own limits.

The cases are numerous in which the courts have decided that the statutory limitations upon the right of emancipation are merely police regulations, and do not vitiate or affect emancipation result-

ing from the operation of the laws of a foreign country, even where slaves are taken to such foreign country for the express purpose of avoiding such limitations.

In Tennessee the authorities are full and satisfactory on this subject. *Vide* 6 Yerger, 119; 7 do. 552. These cases, especially the latter, cover the whole ground we have occupied, and establish every position for which we contend.

In Kentucky the same principle has been frequently recognized. 1 Bibb, 422. 3 Munroe, 104. In Virginia it has been decided, that a will made at a time when the law prohibited emancipation, and which provided for the emancipation of the slaves of the testator, whenever a law should be passed authorizing manumission, was not void; and that upon the passage, many years after testator's death, of a general law authorizing manumission, such will took effect and could be legally executed. 2 Call's Reports, 319, 357.

This case is strong in support of our views. The general principle is also contained in 1 Leigh's R. 172. In Louisiana, the doctrine for which we contend is recognized fully. 8 Louisiana R. 475; 11 do. 499; 14 do. 410.

The appellants may be safely challenged to produce a single case in which it has been decided, that it is illegal to send a slave to a foreign country, there to remain free. Such is the provision of Isaac Ross's will. It directs not only the transportation of his slaves to Africa, but their maintenance there; precluding thereby any conclusion that said slaves, when freed, are to be brought back to Mississippi.

All the cases cited on the other side, are cases in which the attempt was made to clothe slaves with the attributes of freedom, within a state where emancipation was prohibited or limited by express law. They are all based upon the same reason advanced in the case from Howard, viz: that the emancipation attempted, being intended to take effect ultimately within the state, was in fraud of the law, producing the very evil which it was the object of the law to prohibit.

But we go further, and say that sending slaves out of this state, so far from being against, is in perfect accordance with its declared fundamental policy. The old constitution and laws place

many restrictions upon the introduction of slaves into the state. Our new constitution has prohibited entirely their introduction as merchandise. See Constitution, article Slaves, section 2. This fundamental policy has been acknowledged and carried out by the legislature, who in the act of May, 1837, entitled an act, &c., have guarded it with heavy penalties. The constitution and laws of Mississippi have both declared the policy of the state to be opposed to the importation of slaves. Had it been her policy to prohibit exportation also, her intentions would have been indicated in the same manner. So important a subject would not have been pretermitted.

The policy of the state is to be gathered from its constitution and laws, not from popular prejudice or transient public opinion. Public opinion must be expressed in the shape of settled law, before the courts will notice it as a rule of decision. Whatever, then, may be the public prejudice against this disposition of slave property, it can have no influence, because it is entitled to no consideration. It is not the province of the courts to make public policy, but simply to declare it as it exists. We will not pursue this point further. If our views are correct, then, the provision of Isaac Ross' will directing the transportation of his slaves to Africa is not illegal, and the court will not interfere to prevent its execution.

We come now to the second point of the argument, which involves the capacity of the Colonization Society to act as trustee, and also the legality of the residuary trusts.

It is contended that the Colonization Society have no capacity to execute the trusts of the will; the act of incorporation having limited their powers, to the colonization on the coast of Africa, of free persons of color residing in the United States.

The language of the clause of the charter of the Colonization Society alluded to and relied on, after providing that the society might take by donation, &c. is this: "And dispose of according to by-laws and ordinances regulating the same, now, or hereafter to be prescribed, all such lands, tenements, or hereditaments, money, goods, or chattels, as they shall determine most conducive to the colonizing, with their own consent, on the coast of Africa,

the free people of color residing in the United States, and for no other purpose whatsoever."

It is conceived this delegation of powers relates solely to the objects and purposes for which the society may buy and sell real estate and other property, and is not a limitation of their general powers. The object of the legislature seems to have been to prevent the society from trading for general purposes or any purposes other than those connected with the colonization of free persons of color in Africa. The general powers of the society are not defined by the charter, but probably could be collected from the articles of association existing prior to the passage of the act of incorporation; but admitting the society have not capacity under their charter to colonize slaves on the coast of Africa, is there any sound reason why they may not be constituted trustees to convey slaves to Africa, where they by operation of law become free, and there colonize them under the same auspices with those who were free before they left. We apprehend the power to execute a trust may be exercised by a corporation without any express grant, and although it may not be in the nature of the powers granted. In executing the trust they act in the place of the party creating the trust, and the capacities of the grantor and devisor of the trust are carried to the trustee, by the instrument conferring the trust.

At common law it is admitted a corporation cannot be seized to an use, but equity will inforce the execution of a trust. See 2 Bacon's Abridgement, 263; Gilbert on Uses and Trusts, s. 170.

It was once questioned whether a corporation could be appointed executor, because it could not take an oath; but it is now settled it can, and may appoint a syndic to take out letters and take the oath. 6 Petersdorf's Abridgement, 629–30; Toller on Executors, 30, 31.

It has been decided that a corporation may be a trustee, and that when the demise to a corporate body (in trust) was void by the statute of mortmain, the court would decree its execution by the heir. Sanders on Uses and Trusts, 236; 1 Vesey, sen. 467–8.

In the case in 1 Brown's Chancery Reports, 81, it is said, that although the devise be void at law, on account of the statutes of mortmain, yet the trust is sufficiently created to fasten itself upon

any estate the law may raise.    This is the ground on which courts of equity have decreed in cases where no trustee is named.

It is a general rule in equity, that whenever a trust exists, and the party creating it has appointed no competent person to execute it, or the person appointed fails and refuses to act, equity will, in the first case, follow the legal estate, and decree the person in whom the estate is vested to execute the trust; and, in the latter case, will compel its execution.    For it is a rule which admits of no exception, that a court of equity never wants a trustee. Coke Lit. 290, b. Butler's note (1); Ibid, 113, a. Butler's note (1); 1 Story's Equity, sec. 98, p. 114; 2 Story's Equity, sec. 976, p. 240; 9 Cowen's Rep. 437.

Generally where the property has been bequeathed in trust, without the appointment of a trustee, if it is personal estate, the personal representative is deemed the trustee; and if real estate, the heir is decreed the trustee and bound to its execution.    9 Peters R. 505; 1 Maddox Ch. P. 365; 2 Story's Eq. 319–20–21.

From these authorities, it would appear to be a matter of no importance whether the American Colonization Society have capacity to execute the trusts of the will in favor of the slaves or not, as, if it be admitted that the trust of the will requiring their colonization in Liberia is a valid trust, the court would compel the executors to execute it.

But it is objected that the persons for whose benefit the trust is created, have no civil capacity to invoke the aid of a court of equity, and consequently the court cannot interpose.

The bill charges that the executors are about to execute the trusts of the will, and claims that the complainants are entitled to the estate by a resulting or implied trust, (the trusts in the will by which the descent to them was cut off being void,) and prays a delivery of the estate to them as owners: now if the object and substance of the trusts of the will are not void, the complainants have no right to interfere, nor to complain, as they have no interest whatever in the estate.

The will having required the real estate to be sold by the executors, a court of equity will view it as money, and it must be treated as such.

The trustees having commenced executing, or having declared

their intention to execute the trust, the court should not interpose to prevent them, unless the trust is unlawful; and although the trust may be of such a nature that the court could not enforce its execution, yet those entrusted with its execution may carry it into effect; and the heir cannot claim a resulting trust until the trust declared has failed by a refusal or neglect to execute it within a reasonable time.

As, for instance, a devise to an executor in trust to sell, if in his discretion he shall deem it proper, and to vest the funds in any manner he thought best for the interest of the estate. Here the executor having a discretion, could not be compelled to execute the trust, yet clearly he might do so at pleasure; and a court of chancery would not interfere in behalf of the heir until the executor had refused to act, or such length of time had elapsed as raised a presumption he would not execute the trust.

And it may be stated as a general rule that a trust which is not forbidden by law may be executed, although on failure of execution, the condition on which the estate was granted was broken, and the heir might enter. And it may be executed although the *cestui que trust* has no remedy to enforce performance. 4 Wheaton's Rep. 35. See Porter's case, 1 Coke, 22, b.

A trust is a condition at common law, and it is well settled, that although the performance of the condition cannot be enforced, the party whose estate depends upon its performance may do it to prevent a forfeiture of his estate.

And a corporation may accept an estate on condition foreign to the nature of its institutions, which it cannot be compelled to perform; but if the performance of the conditions be not unlawful, the corporation will be permitted to enforce them for the purpose of avoiding a forfeiture of the estate. And in the case in 1 Vesey, sen. 467–8, the attempt on the part of a college to deal with an estate devised to them on certain conditions, in the same manner they dealt with their own, was prevented, and they compelled to perform the conditions as prescribed by the donor.

But if the court should be of opinion the will is void so far as it requires the slaves to be colonized in Africa, the heirs are not entitled to the estate, because there is a residuary legatee. And as the whole estate is required to be turned into money, it

must pass under the will as personal estate; and if the specific legacies are void, as being contrary to law, the whole fund falls into the residuum; and if that be well bequeathed, the residuary legatee will take, and not the heir. 3 Howard's Rep. 337.

By the will of Isaac Ross, the executors are required to sell the real estate, and such of the slaves as decline the privilege of going to Liberia: and the first residuary clause appropriates the whole fund thus raised to the payment of the expenses of transporting his slaves to Africa, and to their support and maintenance while there under the direction of the American Colonization Society, as trustee for that purpose. But if his slaves elect not to go to Liberia, then they (except certain ones named) are to be sold, as the remainder of his estate, and the proceeds, as also the proceeds of all his other estate, to be paid over to the American Colonization Society, to be put out at interest, and the interest to be applied to the establishment of a seminary of learning in Liberia, and its support for one hundred years; after which the principal and interest to be given to such government as may exist at Liberia; and if there be no government existing in Liberia, the remainder over to the state of Mississippi.

It is objected that this residuary bequest is also void, because the American Colonization Society is incompetent to take, and to execute the trust created by the residuary bequest. We conceive we have sufficiently shown the capacity of the American Colonization Society to execute any trust which is not unlawful, or which a private person could execute. The main object of the Society is the colonization in Africa of free persons of color.

The term Colonizing would seem to include every thing necessary to the populating, protecting and maintaining a new, and previously uninhabited territory. It would unquestionably include the necessary preparation for removing the colonists, such as ships, wagons, or other conveyances, and it cannot be justly contended that a government or society had done its duty to those who removed to a new colony, when they had placed them on the soil. The history of the colonization of the territories which now constitute the United States shows, that it was considered necessary to provide for the support, maintenance and education of the colonists after they were settled. Learning and religion seem to have

engrossed as much of their attention as the common necessaries of life. Learning appears to be an object of peculiar favor with our government and our people. Donations are frequently made by the legislature to assist in extending its benefits to all classes of our people, except that class for whose benefit this bequest is intended; and it is only denied to them, as a matter of state policy, and cannot operate beyond the limits of the state.

The endowments of colleges or seminaries of learning of any description has met with peculiar encouragement in England, without reference to the location; as their courts give all the aid within their power to foreign charities. 1 Brown Chan. Rep. 571, 171, 144; 14 Vesey's Rep. 537; 16 Ves. 330. And the courts of the United States have recognized and acted upon the same principle. 3 Peters Rep. 501, 502.

The statutes against superstitious uses have been held not to apply to a devise of land for the maintenance of free schools. 2 Story's Equity, 394, 395; 1 Coke's Rep. 22, (*b.*); 4 Ib. 116, (*b.*); Coke Eliz. 288; 8 Coke's Rep. 130.

Under the statute of Elizabeth for regulation of charitable uses, which must be regarded as declaratory of the common law, and only intended to limit and control the operation of the statute of *mortmain,* the courts of England have gone great lengths to sustain a charitable devise, notwithstanding the want of competency in the devisee to take; and when there was no devisee in being; or when the devise was void in law for misnomer of the college; or when no particular object of the charity was designated; or when the object of the charity was against the policy of the law. In all these cases the courts declare that as charity is the principal object of the devise, they will not suffer the devisor's bounty to be defeated, when the defects can be cured by the court, and full effect given to the main object of the devise. 1 Chan. Cases, 157, 267, 135; 2 Freeman's Rep. 261; 7 Vesey, 36, 73, 74, 490; 1 Vernon, 248; 2 Vernon, 266; 1 Merivail's Rep. 55, 100; 3 Brown's Chan. Cases, 166, 492; 2 Vesey, jr. 380; 3 Peters Supreme Court R. 99; 15 Ves. 232; 2 Chan. Cases, 13; 3 Ves. jr. 714.

In conclusion, we would add, that from the language of the act of incorporation, the American Colonization Society are authorized to take, by devise or otherwise, any land, tenements, &c. and dis-

54*

pose of, according to by-laws, all such lands, &c. as they shall determine most conducive to the colonizing in Africa free people of color. From which it appears evident the American Colonization Society are the legal judges whether the bequest coupled with the specific trusts as it is, is conducive to the colonizing, with their own consent, on the coast of Africa, the free people of color residing in the United States. If the Society have determined that the establishing a seminary of learning in the colony is conducive to the objects of the Society, it would be a considerable stretch of judicial discretion to decide such an institution not to be conducive to colonization, and to declare the devise void, because the object was improper.

· We cannot perceive the slightest illegality or impropriety in the residuary bequest to the Colonization Society, in trust for the establishment, at Liberia, of a seminary of learning. Although, then, the previous provisions of the will should be declared invalid, this must stand, unless it be decided that education is not conducive to the success and prosperity of a colony.

Upon both points taken in this case, we think the court will not interfere to prevent the execution of the trusts.

If the court comes to the same conclusion, then the demurrer below was well made, and the decree of the chancellor must be affirmed.

D. MAYES for appellants.

I agree, with the counsel for the appellees, that all the questions in the case resolve themselves into two: 1. Are the provisions of the will, for the manumission of the slaves, authorized by and valid in law? 2. If not so, are the bequests for the establishment of a school in Liberia, or Mississippi, valid?

These questions have been ably, and I hope satisfactorily, examined by my coadjutors, on authority. I will endeavor to test them, at least the first, by principle.

The appellants being next of kin to the testator, their right to succeed to his estate, real and personal, stands on grounds unquestionable, unless by a valid testamentary disposition of his property, their rights, under the statute law of the state, are set aside: for the law of descents and distribution can be superseded and set

aside no otherwise than by a will authorized by law. We show and rely on the statute law of the state regulating descents and distributions, made in conformity with sound policy, and in support of our natural (though not perfect) right, by the law making power, whose competency is unquestionable.

Our opponents, to overreach this our right, founded in the statute of the state, set up the will, and claim under its provisions. It therefore rests on them to prove its validity. The questions upon which its validity depends, they have not met and discussed, nor has the chancellor done so in the long written opinion, which they have adduced as part of their argument. In judicial investigations, it is proof, not assertion, that weighs with the court. I shall, therefore, take nothing for granted, knowingly, but that which is evident, and argue from evident truths or established principles of law.

1. I assume, as incontrovertible and self-evident, that the dispositions attempted to be made by the testator, of his estate, cannot take effect and overreach the law of descents and distribution, unless he had power to make such disposition of his property.

2. That, if he had power to do so, he derived that power from the law of nature or from the law of the land.

The counsel for the appellees have not, nor has the chancellor, proved, or attempted to prove, that he ever had this power. They assume, as granted or as incontrovertible, the very point in controversy, to wit: that the power existed; and then attempt to prove that it has not been destroyed. In a case of so much magnitude to the parties, and involving principles of such vital importance to the community, we must go more deliberately and methodically to work. In this investigation, it is important, to a just and sound determination, that we first examine, in its full extent, the foundation of the claim of the appellants. They are the issue of the testator, descended from his loins, and his next of kin. Being such, the legislature has appointed them his heirs, by the statutes of the state. Their claim, then, as next of kin, rests upon the clear and indubitable will of the legislature, expressed in the law of the land. Nor is this all. It is also a natural right, though of that class called by civilians an imperfect right. It has been considered of this high origin—founded in nature itself—not only in

every civilized community in christendom, but was recognized as such, and therefore established, by the municipal law of civilized communities before the christian era, and goes as far back as we can trace the institutions of men. Indeed it seems to have the express sanction and seal of God himself in holy writ. A few quotations, from eminently learned jurists, shall establish this. To none, not distinguished for learning and ability, will I refer.

Mr. Christian, in his note to 2 Black. Com. 2, contends that, by nature, a man may acquire a right to property which continues during his life, and then proceeds: "I am obliged, also, to differ from the learned judge, and all writers upon general law who maintain that children have no better right to succeed to the property of their deceased parents than strangers; and that the preference given to them originates solely in political establishments. I know no other criterion by which we can determine any rule or obligation to be founded in nature, than its universality, and by inquiring whether it is not, and has not been, in all countries and ages, agreeable to the feelings, affections and reason of mankind. The affection of parents towards their children, is the most powerful and universal principle which nature has implanted in the human breast, and it cannot be conceived that, even in the most savage state, any one is so destitute of that affection, and of reason, who would not revolt at the position that a stranger has as good a right as his children to the property of a deceased parent," &c.

In his justly celebrated Institutes of Natural Law, p. 117, Rutherforth, in discussing this question, comes to the conclusion that children have not a *perfect* right, by the laws of nature, to succeed to the property of their deceased parents, and then proceeds: "It is, indeed, very evident that a parent ought to do the best that he can for the welfare of his children; and, consequently, that he does not do his duty if he suffers them, through any act or neglect of his, to lose such goods as he had in his disposal, and as he might have secured to them after his death. But this duty is of the imperfect sort; the children have no strict right to the goods; and what is done contrary to this duty, and to their imperfect right, will only be wrong, and not void. However, when a parent dies possessed of goods, and, without any just reason, gives them away from his children, or causelessly disinherits them, civil laws

Ross and Ross *v.* Duncan *et al.,* and same *v.* Vertner *et al.*

do well to interpose and set that will aside; not because the children had *naturally* a *strict right* to inherit, without the interposition of any positive law, but the law, having authority over the person of the parent, does well to take care that he shall, in all respects, discharge his duty, or to discharge it for him where he has neglected it."

At page 121, the same learned author continues: "The first duty of kindness which a man owes, is to his children; he owes them the duty of not only maintaining them, but likewise of doing his best endeavors towards putting them in such a condition as to make their life easy and comfortable to them. They are the principal objects of his regard, or have of all other persons the highest reason to expect his favor and bounty. Indeed, as he was the immediate cause of their coming into the world, it can scarce be looked upon as a matter of favor and bounty in him to make them as happy as he can, whilst they continue in it; he might rather be charged with cruelty, if he were to do otherwise. This then being the principal instance of kindness that every person who has children is obliged to perform, their claim to inherit his goods upon the principle already laid down will stand first, if he die intestate."

To the same effect is Grotius, book 2, chap. 7, sec. 4.

Rutherforth further remarks, that "what we say of children in the first degree of descents, may likewise be applied to those of the second or third degree, that is, to a man's grand children," "not only because they stand in the place of their father, who would have inherited if he had been alive, but because it is the duty of the remote parent as the remote cause of their existence to show them all the kindness in his power."

In Roper on Wills, p. 2, note 2, we read, "the succession to the heirs of the body, and in case of the defect of such representatives, to the next in proximity of blood, if not a law of nature, seems so to correspond with its dictates, that history hardly carries us back to a time when the notion and admission of this claim did not prevail among mankind. The suggestions of a common feeling appear, therefore, to have made this an universal rule of transmission, and to have established it in communities, widely separated by time and place. Thus, the representation in the channel of

blood and proximity seems to have had its foundation higher than any positive institutions, though to positive institutions we must of course refer the modifications of this rule of succession."

Hence then, we perceive, that the complainants below, (here appellants,) do not only found their claim in the positive laws of the land, the statutes of descent and of distribution, but that claim "has its foundations higher than in any positive institutions, though to positive institutions we must refer the modifications of this rule." That their claim is so imperious, that if the ancestor omit to make them his successors, "the civil laws do well to interpose and set his will aside; not because the children had naturally a strict right to inherit, without the interposition of any positive laws; but the law having authority over the person of the parent, does well to take care that he shall in all respects discharge his duty, or to discharge it for him where he has neglected it." Based then upon the positive law of the land, and calling to our aid this our right, sanctioned by nature itself, we can only be defeated by an opposing right, equally manifest.

According to no sound rule of judicial action can the parent succeed over the law, in an attempt to depart from the performance of his natural duty, unless there can be made manifest some law by which he has the legal right to do so. For we have already seen that he has no such moral right. If his legal power is doubtful, a court will decide against the power and in favor of our right, which is free from doubt, if he has not that power. For that which is certain in law and in moral right can never be overcome by that which is uncertain in law and against natural duty.

The great caution with which the civilized world has proceeded, the tardiness of the steps towards allowing of testamentary dispositions in derogation of the rights of inheritance by blood, the reason which ultimately led to the conferring that power on testators, all demand the most profound consideration of the judge, and challenge his most deliberate and solemn examination that his resolutions and determinations may stand on a sound foundation of enlightened and philosophical jurisprudence.

It is only by a constant recurrence to first principles that salutary systems can be instituted or preserved, either in law, politics, or any science whatever. A hasty glance at the subject of testa-

ments, as allowed in ancient times, may be useful in aid of this examination.

"It appears doubtful whether among the Romans, before the introduction of the laws of the twelve tables, or among the Athenians, before the legislation of Solon, the direct testamentary disposition, even of moveables, was allowed; and among the ancient Germans it appears that the children succeeded to the possession of the parent, and that he had no power to alienate them by his will."

"Till the legislation of Solon, the Athenians did not possess this privilege, as it appears from many authorities, particularly from Plutarch, in his life of Solon, p. 196; nor according to Selden did it exist among the ancient Jews, nor, as we learn from Tacitus, among the Germans of his day."

"The tenderness which continued to prevail among the Romans for the legal heir, is strongly displayed in their provision by the laws, *Furia*, *Voconia*, and *Falcidia*, and more pointedly, perhaps, by their remedy *querela inofficiosi testamenti*, wherever a will was made against the order of natural affection, without a reasonable cause."

"It appears that the most ancient mode of making a testament, among the Romans, was, by converting a man's private will into a public law, for such seems to have been the object and intention of the promulgation or celebration of a testament in the *callatis commitiis, i, e.* in the presence of the Roman people, summoned before the sacerdotal college *per curias.* And according to Heineccius, these assemblages were not convened specially for the purpose of giving sanction to wills, *sed legum, ferendarum magestratuum que creandorum causa immo et ab alia negotia publica, bellum, pacem, judicia, &c.*

Thus was this private disposition by testament, of the property of an individual, promulged and ratified in the same manner as a public law; and for this reason, the *testamenti factio* has, in the text of the imperial law, been said to be *non privati sed publici juris*—D. 28, c. 3; and again by Ulpian, it is said, *legatum est, quod legis, modo*—*testamento relinquitus.* Ulp. tit. 24, sec. 1."

The foregoing is extracted from Roper on Wills, pages 1 and 2,

and note 2, vol. 1, the whole of which note is well worthy of consideration, though too lengthy to find a place here.

Blackstone, 2d Com. 12, informs us that "while property continued for life, testaments were useless and unknown, and when it became inheritable, the inheritance was for a long time indefeasible, and the children or heirs at law were incapable of exclusion by will."

He then assigns the reason why this first institution of the law of indefeasible inheritance was changed, and the testamentary capacity conferred. That reason was, "it was found that so strict a rule of inheritance, made heirs disobedient and headstrong, defrauded creditors of their just debts, and prevented many provident fathers from dividing or charging their estates as the exigencies of their families required." This introduced pretty generally the right of disposing of one's property by testament.

"This" he continues, "was established in some countries much later than in others. With us, in England, till modern times, a man could only dispose of one third of his moveables from his wife and children, and in general no will was permitted of lands till the reign of Henry the Eighth, and then only of a certain portion; for it was not until after the restoration, that the power of devising real property became so universal as at present."

We are informed by Crabbe, in his History of English Law, 96, that as to the disposal of a man's effects at his death, this was not governed by the same law as that which regulated the alienation of lands; when any one wished to make his will, if he were not involved in debt, all his movables were divided into three equal parts, of which one belonged to his heir, another to his wife, and a third was reserved to himself." This third, reserved to himself, he might dispose of by will.

Again at page 98, "If the person was encumbered with debts, he could make no disposition of his effects, without the consent of the heir."

Thus stood the English law in the reign of Henry II. and thus we have a slight and imperfect view of the great caution with which the law proceeded in allowing testamentary dispositions, to deprive the heir of his succession, in times ancient and modern, and of the reason why he was allowed to do so, viz: because an

indefeasible right in descendants was at length found to "make heirs disobedient and headstrong, to deprive creditors of their just demands, and to prevent many prudent fathers from charging or dividing their estates as the exigencies of their families required."

And from this we may discover the weight, if any it has, of the argument of the appellees, founded on the assumption that "it has ever been a cherished principle of the common law, to carry into effect those intentions in relation to property, which a man wills to be performed after his death."

But as that argument will be specially considered hereafter, I pass it by for the present.

I now proceed upon the supposition that it is shown: 1. That the right of inheritance is not only founded in the positive law of the land, but has its source in nature itself, though a right not of the perfect class. 2. That it is of higher antiquity, as recognized and established by human law, than the testamentary right. 3. That this testamentary right, so far as it exists by human law, was instituted, not because of its conforming to natural reason or right, but to prevent certain abuses growing out of the original indefeasible nature of the right of inheritance.

Thus prepared, we may the better examine: 1. Does the law of nature confer on the testator the power to make a disposition of his property, such as he has here attempted? and if not, 2. Do the laws of the land confer on him that power? I maintain and will prove the negative of each.

Upon the first question, that of power in virtue of the law of nature, no writer goes farther than Rutherforth. He contends that a man may, by the law of nature, dispose of his property by will if the heir (by which is meant the legatee) accept the legacy before the testator's death, but not otherwise. In his discussion of this subject he concludes with these words:

"Whenever I speak, hereafter, of the power of disposing of our goods by will, as naturally incident to the right of property, without the aid of civil laws, the reader must remember that I mean a will under the circumstances just now described, where the heir has accepted before the testator's death." 1 Institutes of Natural Law, 109.

"The most usual and effectual way of abandoning property,

[says Blackstone, 2. Com. 10,] is by the death of the occupant; when, both the actual possession and intention of keeping possession ceasing, the property, which is founded on such possession and intention, ought also to cease of course. For, naturally speaking, the instant a man ceases to be, he ceases to have any dominion; else if he had a right to dispose of his acquisitions, one moment beyond his life, he would also have a right to direct their disposal for a million of ages after him, which would be highly absurd and inconvenient."

At page 11, he proceeds: "The right of inheritance or descent to the children, seems to have been allowed much earlier than the right of devising by testament."

At page 12, it is said, "While property continued for life, testaments were useless and unknown, and when it became inheritable, the inheritance was long indefeasible, and the children, or heirs at law, were incapable of exclusion by will."

He concludes by saying: " Wills, therefore, and testaments, rights of inheritance, and succession, are all of them creatures of the civil or municipial laws, and accordingly are in all respects regulated by them."

The celebrated D'Aguesseau, in a passage that will be hereafter more fully extracted, maintains, that the faculty of disposing by testament, " is contrary to the law of nature, by which death deprives a man of every right over his property."

To the like effect is every writer who treats of the subject, and were they silent, no truth seems more self evident, than that at death, all dominion over property ceases. That by nature, a man cannot have dominion, beyond the term of his own life, and that he cannot confer on another, an interest which he himself had not, that is an interest beyond his life. It is therefore believed, that so far from the testator's possessing the right or power to make this will, by the law of nature, he could not by that law, make any valid testamentary disposition of his property. Having shown this, it plainly follows, that it does not rest on us to show, that by human law the power to make the present disposition is denied to, or taken from him; but on the contrary, it devolves on our adversaries to prove the institution of, and point to, some human law,

which confers this power. This they have neither done nor attempted to do, but by assertion.

Although the burthen of proof rightfully rests with them, and they have failed to adduce it, I will prove that no such human law exists. Speaking in reference to wills, we assume, that there is no law instituted by man in force in Mississippi, but, 1. The common law. 2. Statute law. Does the common law confer the power to make the disposition contained in this will? The opposing counsel would at one time seem to rest the case on the law of nature, declaring that "the right of the master to manumit his slave is a natural attribute of the condition of slavery;" and at another, appear to put it on common law ground, assuming that "it has ever been a cherished principle of the common law to carry into effect those intentions in relation to the disposition of property, which a man wills to be performed after his death."

The chancellor's whole argument will, when closely examined, be found to turn on the assumption, that "the right to manumit a slave is perfect and undoubted at common law, by will, deed or otherwise." Here then we join issue with the counsel and the chancellor, and undertake to prove, 1. That no such power existed at the common law, and 2. That if it did exist at the common law, such common law has not been adopted in Mississippi; and further, that if such common law existed, and its principles are in force in Mississippi, 3. The common law does not support the will, but declares it invalid. 1. No such power existed at common law. Extracts from Blackstone and from Crabbe, have already been given to show the limited extent to which the common law indulged the testamentary right.

To these extracts we would again solicit the attention of the court, and in further evidence of the common law, we add from 1 Roper on Wills, 5.

"But though testaments of moveables were permitted by the ancient law of England, according to Glanville and Bracton, yet the power extended only to one third, called the dead man's part; which limitation seemed to prevail in London and in York after it had fallen into disuse in other parts of the kingdom, till at length, by several statutes, the testamentary power was thrown generally open. According to the author of the Commentaries,

" by the ancient common law of the land, and which continued at the time of magna charta, a man's goods were to be divided into three parts, of which one went to his heirs, or lineal descendants, another to his wife, and the third was at his own disposal ; or if he died without a wife, he might dispose of one moiety, and the other went to his children ; if he had no children, the wife was entitled to one moiety, and he might bequeath the other ; but if he died without wife or issue, the whole was at his own disposal. The shares of the wife or children were called their reasonable parts, and the writ *de rationabili, parte bonorum,* was given to recover them.

" In the reign of Edward III. this right of the wife and children was still held to be the common law, though frequently pleaded as the local custom of Berks, Devon, and other counties ; Sir Henry Finch lays it down expressly to be the general law of the land in the reign of Charles I. But the law has since been altered by imperceptible degrees, and the deceased may now bequeath the whole of his goods and chattels, though it would be difficult to trace out when this alteration began."

It was not until the passage of the act of 11th Geo. I. c. 18, that this general right of testamentary disposition extended to the whole kingdom : where it existed before that time it was not by force of the common law, but in some counties it arose from and was founded on special custom ; in others, it rested on act of parliament, such as iv W. and M. c. 2. and ii. and iii Anne, c. 5. This will be found to be confirmed by Thomas' Coke, and in Fitzherbert's Natura Brevium, we find the writ *de rationabili parte bonorum* given, as the common law remedy appointed for the widow or issue. Indeed I had never believed, from my first reading of Blackstone and Coke, that there was any lawyer doubting on this subject, until I so learned in this case. So far then is it from the fact that the common law supports this will, we find that by it, the testator could only dispose by testament of one half of his personalty, and of no part of the realty.

If, however, the common law conferred the power to dispose of the whole of the effects by will, it does not follow that the present will is valid.

The power to dispose of my estate by will is one thing ; the

power to manumit my slaves by will, is quite a different matter. This power did not exist at common law. I should have been much surprised at this assertion of the chancellor, and more at his supposing that it had any application here, had I been ignorant that a similar assertion had been made by another American judge, and that hasty dicta were not wanting to mislead in that respect.

The common law in relation to manumission, is exclusively confined to villeins, who are sometimes called slaves. Villeins were not manumitted by will, as far as known to me, and I have ever supposed the saying by some American judges, to have been hasty, and without examination or reflection. Except in the instance of our chancellor, it occurs as mere *obiter*, thrown out loosely, nothing predicated on it; and constituting no point in the cause, received no examination. Let us now examine it.

In 1st Thomas' Coke, 497, we find this: "There be two kinds of manumissions—one express, and the other implied. Express, when the villein by deed, in express words, is manumised and made free. The other implied, by doing some act which maketh in judgment of law the villein free; albeit there be no express words of manumission or enfranchisement. If a villein be manumised, albeit he become ungrateful to the Lord in the highest degree, yet the manumission remains good, and herein the common law differeth from the civil law."

The instances of implied manumission then follow, yet we have nothing of wills.

In Cooper's Justinian, 417, it is said: "The ancient form of manumitting villeins was thus: "If any person be desirous of enfranchising his slave, let him, with his right hand, deliver the slave to the sheriff, in full county, proclaim him exempt from the bond of servitude, by manumission. Show him open gates and ways, deliver him fire arms, to wit, a lance and a sword, whereupon he becomes a free man." Harris from Wilkin's Leges Anglo-Saxonicæ. Afterwards manumission of villeins was conferred by grant and release, of which Harris has given a form in the Complete Clerk, 1676."

Crabb, in his history of the English law, 82, informs us, "when writing became common, villeins were enfranchised by the lord's deed."

55*

In Sullivan's Lectures, vol. 2, commencing at page 75, is a treatise "of the methods invented to destroy villeinage—the bent of the English law towards liberty," for so he heads and entitles the chapter. We there have what is intended for a full treatise on this subject, and no such mode of manumission, as that by will, is to be found.

Blackstone, 2 Com. 74, takes up the same subject, and no allusion to will, as a method of manumission, is to be found in his pages.

Preston, Roper and Roberts, in treating of wills, are equally silent; and no author, to whom I have ever had access, advances such an idea.

If, then, when expressly treating of manumission, neither Littleton nor Coke, nor in their notes, Hargrave, Butler, or Thomas, allude to a will; if Cooper, Crabb, Sullivan and Blackstone in their researches, have not discovered it, may we not well demand on what foundation rests the assertion, that "the right to manumit a slave is perfect and undoubted at common law, by will, deed or otherwise."

Having furnished, as I believe, no slight reason to doubt the chancellor's position, I will concede, for the purposes of the argument, that he is right, and show,

2. If the power to manumit villeins existed at the common law, that part of the common law has not been adopted, and constitutes no part of the law of Mississippi.

The tenure of villeinage never existed in Georgia, or in Mississippi. It had ceased in England at least as early as the reign of Charles the Second. Those who anciently held by the tenure of villeinage, were then converted into tenants by copy of court roll. Crabb, in his history of English law, 536, asserts that at this period, there was not a villein in England.

Villeinage being then at an end, the common law rules incidental to it, of course ceased with it. They were rules instituted in reference to a relation, which had ceased to be a lawful relation; and with the destruction of the relation, the principle thing, the rules, which were but incidents, also ceased.

These rules, then, were not in being after the reign of Charles the Second. Prior to that time they had been law; subsequently

we find them but as matters of history, they are only so treated of, and clearly are of no other nature.

Bearing this in mind, let us next take into view, that it was not until the year 1732 that the project was formed for the settlement of Georgia, from which sprang Mississippi. This project, then formed, led to the charter granted by George the Second, to Lord Percival and others. See Marsh Col. c. 9, p. 247; Stokes' history of Col. 113; 1 Story on the Constitution, 128.

In conformity with the usage of nations, when the colony of Georgia was settled, the laws of England, of a general nature and suited to their condition, became the laws of the colony. When they emigrated, they carried their law with them, as part of their birthright. What law? The law of villeinage? Certainly not. It was no part of their law. It had been the law of the subjects of the predecessors of Charles the Second, but was never the law of the subjects of George the First. It had no existence in England. It had ceased before they were in being, and they could not have carried that law or adopted it. If they adopted it at all, it must either have been done expressly or by reasonable implication. They did not do so expressly, and there is no reason to imply its adoption.

There is no reason to believe they thought of it, or cared about it, if thought of. For they had no tenure to which it applied, no villeins to whom it related, no lords to whom it referred. It did not bear directly or remotely on any human being of their community. As well might it be said that they adopted the whole body of the common law, as it stood in the reign of William the Conqueror or of Alfred, as that they adopted the law as it stood prior to the reign of Charles the Second.

Law is a practical matter, and must not rest on loose generalities. It is ever changing with the varying condition and constitution of society. If adopted, it results that we must fix the period of its adoption; otherwise we have no certainty. For the law of one century, in one organization of society, is not the law of the next century, when the organization and structure of society has changed. He is but shallowly read in the common law, who does not know that that law, as it stood prior to Charles II, was a very different body from the law as it was in 1732.

The rule on the subject of the adoption of the laws of the parent state, where it rests on implication, is the only sensible rule that can be conceived of. It is well known to even every tyro in the law, that the colony adopts the laws of the parent state, as they were at the time of emigration; and then so far only as those laws apply and are suited to the condition of the infant community. There was no law of manumission in England at the time of emigration, and if there had been, it did not apply to their condition, there being in their community neither villein nor lord. See 1 Kent's Com. 472–73, and note *a.*

If, however, the law of villeinage was adopted by the colony of Georgia, does it thence follow that it was made or became the law of master and slave in Mississippi? Has the legislature declared that the law of villeinage, in any of its parts, as it stood in England before the reign of Charles II, shall be the law of Mississippi, in relation to master and slave? It has not. Have the courts power to make the law of villeinage the law of master and slave? They have not. They claim no such power. It is their office to apply law to cases, not to make law. And disguise it as we will, call it adjudication or what not, the name does not change the nature of the thing ; and to apply the English law of manumission of villeins to the manumission of the slaves of the citizens of Mississippi, is gross and glaring usurpation of the legislative power.

Were it required that the appellants prove that the law of villeinage is not the law of this land, in reference to slaves, it would not be difficult.

By the English law of villeinage, (or slavery if you please,) the child belonged to the owner of the father; by the law of Mississippi, it belongs to the owner of the mother. By the former, villeins or slaves were capable of contracting marriage, and the issue of such marriage was legitimate, and inherited as other legitimate children. By our law, slaves have not the capacity of contracting marriage, and all children of slaves are consequently illegitimate. By the law of villeinage all bastards were born free. By the law of slavery in Mississippi, all the bastard children of female slaves are born slaves. By the law of villeinage, the villein enjoyed the right of acquiring and holding property. Slaves in

Mississippi can do neither.   A villein was a free man, and enjoyed all the rights of such, except as between himself and his lord.   Not so of the slaves in Mississippi.   In fine, there is not one trait of resemblance between villeinage at the common law and our slavery.   On what foundation then can rest the implication, that as to manumission, the common law of England respecting villein and lord, is the law of Mississippi, as between master and slave.   Is it that the policy of England, respecting her villeins, is the same with the state policy of Mississippi, relating to slavery?   They are the very reverse of each other.

Sullivan, in his Lecture before referred to, entitles it: "Of the method invented to destroy villeinage—the bent of the English law towards liberty."   And Blackstone, in treating of the law of enfranchisement in England, accounts for the law of manumission as it prevailed there, by declaring, that "the law is always ready to catch at any thing in favor of liberty."

Have the people of Mississippi,- by legislation, or any other means, adopted as part of her system these methods invented to destroy slavery?   Have her laws or has her state policy, relative to slaves, this "bent towards liberty?"   Are her laws "always ready to catch at any thing in favor of liberty?"

The foregoing quotations, and the whole history of villeinage in England, shows that the whole policy of England was to put an end to villeinage, that it aimed at its destruction, and finally overthrew and wholly subverted the institution.   These rules of manumission were but means "invented for the special purpose of effecting this end," and they proved effectual.   In England this was sound policy; it was necessary to the peace and prosperity of the kingdom, and therefore it was necessary and good statesmanship to aim at its accomplishment.   Villeinage strengthened the barons, and weakened the sovereign, fostering and supporting rebellion, and endangering the integrity of the kingdom.   Its destruction wrested from the hands of these haughty and rebellious lords the instruments of their strength, and gave firmness and stability founded in the consequent increased strength of the crown.   Every villein manumised gave to the king a new subject, wrested from dependence on and obedience to the will of a rival baron.   From these, and from other causes not necessary to be enumera-

ted, sprung up the principle of policy under consideration. The courts being but organs through which states carry out their policy, so far as subjects of litigation arise involving in any degree the policy of states, they ever regard a principle of state policy as embodying a law of the highest obligation, and to which law private rights must bend.

Hence, in contracts, whatever may be the merits of a cause, as between the immediate parties, the courts declare contracts void if they militate with the policy of the state. This they do not because of any merit in the defendant's cause, for, considering the case as between the parties only, the law and justice of the case is with the plaintiff. Yet to promote the public policy, to give effect to the paramount law, the plaintiff loses a cause just and lawful as between himself and his adversary. The whole doctrine of the law contracts, *ob turpam causam*, rests on this foundation.

The decisions of the English courts, therefore, on the subject of slavery, rest on a solid foundation, on that of the policy of the sovereign, whose judicial power was delegated to them. In an American state, where slavery exists, but where the principles of abolition have taken such deep root, as to lead to a determination to put an end to slavery, that being the policy of the state, the courts, as the judicial organs of the state, would rightfully pursue the same course. For judges are to regard the policy of the state and give it effect.

In Mississippi we have no such policy as to slaves, our policy and our laws are decidedly anti-abolition. It is to support and sustain the institution, not to break it down. In our laws and policy there are no " means invented to destroy slavery;" there is to be found no " bent towards freedom" of our slaves; our laws are not "always ready to catch at any thing in favor of liberty." Shall our judges then, run in advance of state policy, and counter to it, and invent these means? Are they to give our laws this bent? Is it for them to be always ready to catch at any thing in favor of the liberty of our slaves? or rather shall they not regard our state policy as embodying and containing within it a law of the highest obligation on them, as did the English courts; and upon the same

principle that led those courts to favor manumission; thus carrying out the policy of their government: shall not ours pursue the reverse course, to carry out ours?

Is it conceivable, that when we adopted a policy in reference to our slaves, the opposite of that of England relative to her villeins, we also adopted at the same time the rules there instituted and effectually employed to defeat the very end we had in view? Let us not convict ourselves of such folly. We have not done so by any express declaration, and it is at least an unreasonable, if not an absurd implication. But I am prepared to go further, and again, so far as the argument is concerned, admit, that the common law, as applicable to villeins, is adopted, and is the law of Mississippi, applicable to the relation of master and slave; and further, I will concede that by this common law thus adopted, and thus applied, the master might manumit his slave by will, and yielding all this, no part of which is believed to be true, I will yet prove,

3. That this same common law does not support this will, but on the contrary declares it invalid.

When a villein or slave was manumitted in England, the tie which had bound him to his lord was broken, and he became a free subject to the king, to whom was now due from this newly made free man all the allegiance and subjection which was common to the other subjects of the crown, and in whom was vested, indefeasibly, all the rights of a British subject. It was to strengthen the crown that the manumission most generally occurred. The common law allowed not the lord to send his villein to France or to Germany, there to be manumitted. Expatriation was in direct violation of its rules. Once a subject, always a subject, was indelibly impressed in its whole policy and texture. Here the testator directs that his slaves shall be sent to Africa, under the directions and superintendance of the American Colonization Society. In what book of the common law do we find such a power? And this, the power to devise that the slave or villein shall be sent to a foreign country, out of the king's dominion, must be shown to exist before the common law or any argument founded on it, can have any influence favorable to the appellees.

An argument drawn from the common law is clearly against

them, for not only did it not vest in the lord power to send his villein out of the kingdom, but positively forbid expatriation.

We now come to the inquiry, does the statute law of Mississippi confer the power?

Our statute of wills, Rev. Code, page 32, sec. 14, confers on the testator the power of disposition by will, in terms broad and comprehensive, but not in terms more broad and comprehensive than does the law of England.

In the conduct of this branch of the argument, I am of necessity led to notice, more particularly than I have yet done, the argument of the counsel on the adverse side, and that of the chancellor. The latter I would gladly have passed in silence, but its examination is forced upon me, as it is printed, and therefore relied on as argument in this case, and whatever delicacy may be involved in entering the field of discussion, with one occupying his exalted station, where his decisions are directly called in question, and his reasonings are brought forward in support of them, duty requires that they be fully examined.

The counsel for the appellees proceed thus: 1. " The disposition of property, by last will and testament, has its origin in the earliest period of history." 2. " It has ever been a cherished principle of the common law, to carry into effect those intentions in relation to the disposition of property, 'which a man wills to be performed after his death.' This dominion over property after death, is indulged until it comes in collision with great principles of public policy. It may be safely laid down as an incontrovertible position, that a person may, unless prohibited by law, direct in his will any disposition of his property after his death which he could have legally made during his lifetime."

" Our own statute, on the subject of last wills and testaments, gives this power in the broadest terms. It cannot for a moment be contended, that without an express law prohibiting it, (and even such a law would be unconstitutional,) any person would not have the right to carry or send any portion of his personal property out of the state of Mississippi, to Africa or elsewhere, provided the rights of third persons were not infringed thereby. The owner could either take it himself, or employ an agent as trustee, to effectuate his intention, and would have an undoubted right to

appropriate the proceeds of other property to the accomplishment of the object."

We will take up the foregoing argument, sentence by sentence, and show that it is in every part unsound, or operates against the appellees, to promote whose cause it is advanced. How far it has "ever been the cherished principle of the common law to carry wills into effect," has already been seen.

Let us next inquire, with what propriety it can be said, that "this dominion over property, after death, is indulged until it comes in collision with great principles of public policy." In doing so, we are necessarily led to inquire, in the first place, what this dominion is, which is said to have been so indulged.

We have already seen that the law of nature gave no dominion beyond life, or, if at all extended beyond life, it was a dominion to be exercised by will only, in case of acceptance by the heir, in the life of the testator. It has already been seen that this dominion, such as it is, was, by the common law, only extended to what was the dead man's part. But I have not inquired of the nature or quality of the dominion itself. Was unlimited power conferred— a power given to the dead—to exempt property from the dominion of the living, or was it only a dominion conferred on the dead to say who among the living should exercise dominion? I use the expression "power given to the dead," because a will, the medium through which this dominion is exercised, only takes effect on the death of the testator.

Here it may be proper to go back and look into the reason on which the power of testamentary disposition rests, or the circumstances that gave it birth, and the evils it was intended to obviate. In tracing the history of dominion, or property in goods, as it has existed among mankind, we find that "property, both in land and moveables, being originally acquired by the first taker, it remained in him, by the principles of universal law, till such time as he does some other act which shows an intention to abandon it, for then it becomes, naturally speaking, *publici juris* once more, and is liable to be again appropriated by the first occupant." 2 Black. Com. p. 9.

We further perceive that "the most universal and effectual way of abandoning property is by the death of the occupant; when

both the actual possession and intention of keeping possession, ceasing, the property, which is founded upon such possession and intention, ought also to cease, of course. For, naturally speaking, the instant a man ceases to be, he ceases to have any dominion." Ibid. p. 10.

"All property must therefore cease upon death, considering men as absolute individuals and unconnected with civil society; for then, by the principles before established, the most immediate occupant would acquire a right in all that the deceased possessed. But as, under civilized governments, which are calculated for the peace of mankind, such a constitution would be productive of endless disturbances, the universal law of almost every nation (which is a kind of secondary law of nature) has either given the dying person the power of continuing his property, by disposing of his possession by will, or in case he neglects to dispose of it, or is not permitted to make any disposition at all, the municipal law of the country then steps in and declares who shall be the successor, representative, or heir of the deceased; that is, who alone shall have a right to enter upon this vacant possession, in order to avoid that confusion which its again becoming common would occasion. And further, in case no testament be permitted by the law, or none be made, and no heir be found so qualified as the law requires, still, to prevent the robust title of occupancy from again taking place, the doctrine of escheats is adopted in almost every country." Ibid.

We also ascertain that the right of hereditary succession was long recognized and established, by positive law, before testaments were permitted, or, to use the forcible language of Blackstone, 2d Com. p. 12, "when property became inheritable, the inheritance was long indefeasible, and the children or heirs at law were incapable of exclusion by will, till at length it was found that so strict a rule of inheritance made heirs disobedient and headstrong, defrauded creditors of their just debts, and prevented many prudent fathers from dividing or changing their estates, as the exigencies of their families required. This introduced, pretty generally, the right of disposing of one's property, or at least a part of it, by testament."

We now discover the whole reason upon which the law has progressively come to the adoption of testamentary dispositions.

By the law of nature, when death occurred, the property of the deceased again became common. Having no owner, it was subject to be taken possession of, and belonged to him who first seized it. Why was it necessary, when civil society was formed, to change this law? We have the answer. Such a right, in the nature of things, was "productive of endless disturbances," and the well-being of society demanded of human legislators that means should be devised "to prevent the robust title of occupancy from again taking place." This could only be done by "declaring who alone should have a right to enter upon this vacant possession." This was accomplished by instituting the rule of inheritance.

This right of hereditary succession having been long indefeasible, further experience showed that, in removing the evil that existed in the natural law, the law makers had introduced another evil, which, in its turn, required a remedy. The indefeasible nature of the right of hereditary succession rendered heirs disobedient and headstrong, and prevented many prudent fathers from dividing or changing their estates, as the exigencies of their families required. Hence further municipal regulation was necessary to reduce to proper subjection and dependence, headstrong and disobedient heirs, and to enable prudent fathers to divide or change their estates as the exigencies of their families required. To these ends it was provided that each possessor might select his own successor by his will; that is, that he might declare who only should have a right to enter on his vacant possession. This removed the evils which gave rise to the law rendering defeasible the long indefeasible nature of the right of hereditary succession. This accomplished and perfected the legislative scheme to obviate the evil existing in the law of nature.

It was not intended by the institution of wills, to introduce, at the discretion of the owner of property, the very evil which caused the institution of the rule of inheritance. Yet, such is the effect, if the testamentary capacity extends to, and confers upon, the dead, not only the power to say who among the living, shall inherit or take his estate, but also to the power of making a provision by his will, setting aside the right conferred by the general law upon

his heirs, without providing a successor himself. For if, by will, he deprives them of the right of succession under the municipal law, and if also he omits to confer the right upon any other, his estate thereby becomes *publici juris* once more, and liable to be seized upon by the next comer.

The first and greatest evil was, that on the death of the possessor, his estate was without an owner, and all the legislation, by which were established laws of inheritance, wills and escheats, were human institutions, designed in the most effectual and beneficial manner, to remove this evil, by preventing the property from becoming again common, without introducing other evils; and the second stage of legislation, by which wills were instituted, never was intended and cannot legitimately have the effect of again introducing the very state of things in a particular case, which gave rise to the whole system.

It has never been understood by jurists, that the power to make a will, conferred on the dead, the ability to deprive the living of the use of that property, which the laws of the country had protected him in the enjoyment of, and of which death had deprived him. But it has ever been considered as only conferring on the owner the right, or rather the power, of appointing his own successor, or heir.

The foregoing quotation shows this: It is said to be the power of continuing his property, by disposing of his possessions, by will. Who ever used the words, "dispose of property," to convey the idea, that the thing spoken of, was no longer property? Who ever attempted to convey the idea, that I manumitted my slaves, by saying I had disposed of them? But further, who would say that I continued my property, in my slaves, by setting them free?

Taking the passage entire, in its connexion with the whole chapter, we plainly see that Blackstone does not intend to confine the words, "who shall be successor, representative, or heir of the deceased," to the effect of the law of inheritance, but extends them to the effect of the exercise of the testamentary power also. This is put beyond all doubt, by reference to the thirteenth page, where it is said: "The positive law of society, which is, with us, the municipal law of England, directs it to vest in such persons, as

the last proprietor shall, by will, attended with certain requisites, appoint."

In confirmation, I will copy a short passage from Roberts on Wills, page 7, note (5,) speaking of the Roman law, he says: "The general representative was the heir, and by that title he succeeded, as well to the moveables as immoveables, and when the whole substance devolved, the difference was only between him who was appointed heir by the will, and was called *hæres institutus,* and him who succeeded to the intestate as his natural heir.

"It has been endeavored in a preceding note, to help the student to understand the nature of this appointment of an heir, by will, in the Roman law, before and after the law of the Twelve Tables, by the clause "*uti quisque legassit,*" &c., (which was construed to compromise the *hæridum institutiones* as well as the *legata,*) confirmed the general testamentary power." If the will was of goods only, the legatee was called *hæres testamentarius.*

Let us, then, suppose that I make a will, by which I declare that my estate, real and personal, shall not pass to my kindred, nor escheat to the state, but that it shall belong to him who shall first seize upon it, after my death, with intention to appropriate it to his own use; or in other words, I declare that the laws of this land, shall not apply to my estate, but it shall be governed, after my death, by the law of nature. Would any court decide in this case, that my will, as to my estate, abrogated the laws of the land, and that my heirs should not hold? I presume not, and if not, why not? Only, because I had not, by my will, appointed one to succeed me as owner. That the testamentary power was not conferred to enable me to defeat the laws of inheritance and of escheats, which assigned to my property an owner, but on condition that I would myself, assign an owner of my own choice, to take my estate.

But suppose my property consists of things, which, according to the notions of some nations, would not become common, and liable to be appropriated as property, by any who should seize them, upon my renouncing my dominion, but which things, other states or nations considered, as being the rightful subjects of property, and liable to seizure as such, by any one who could do so, if found without an owner; and that I direct, by my will, that

56*

my property shall not pass to my heirs, nor escheat, but shall be taken to Africa. That it shall not at all be held as property, by any citizen of any state or nation, whose laws forbid their seizing, and appropriating it as such, nor should it be held as property, by any one whatever, but remain exempt from the dominion of man, until seized on by some member, of some community who hold, that in its then condition, it is liable to seizure, and appropriation as property; and that upon such seizure being made, the property shall vest in him who seizes it? Would any judge in Mississippi decide that the laws conferred on me the power to make this will, and that my children were by it, disinherited? Yet, this is precisely the will of Capt. Ross.

Certain nations have abolished and condemn the slave trade; it is countenanced and considered legitimate traffic by others. It is now carried on to a great extent on the coast of Africa. Every negro, having no owner, they regard and treat as public property, and liable to be seized upon and appropriated as private property, by him who can first effect the capture.

If the will, then, of Captain Ross is carried into execution, the effect is, that as to all who hold that negroes, without owners, are liable to seizure and appropriation, his negroes shall be property in a state of nature; but to those who hold that negroes in the enjoyment of their freedom, cannot be reduced to slavery, they shall not be property at all.

It is not at all probable that the event here alluded to will actually happen, yet it illustrates the actual nature of the testamentary disposition here set up, and may not be wholly useless in considering the question, whether the legislature of Mississippi, by her general law of wills, conferred the power?

It has been shown, that according to the reason of the law, the general testamentary capacity which it conferred, only extended to the power to designate the person who should succeed to the property as its owner. In the present case it is not (if the will take effect,) to "vest in such person as the last proprietor has by will appointed." He has not by will declared "who alone shall enter on his vacant possession." Far from it. The very end and aim of the testator was, that it should vest in no one—that no one should succeed to his estate or property in the slaves—that they

should no longer be property. Now, is it not plainly a perversion of the institution of last wills and testaments, the being only allowed for reasons before assigned, that the owner might declare who should succeed him, if we give to the law of wills such application as to enable him to say no man shall succeed him.

Suppose I, owing no debts, direct my executor to throw my property into the ocean. Will not this be an abuse, and not a legitimate use of the testamentary capacity conferred on me by the law of this state, the law only contemplating a power to dispose of my property, to give it to another? Would this court say it conferred the right to destroy it, or to subtract that much from the wealth of the state? I had no such right by nature. God created property, and conferred on man dominion over it, for his use, not for destruction. By his law, the law of nature, when the necessity and ability to use it ceased upon death, it passed, and should pass, to those who survive. The laws of the land, in conferring the power of disposition by will, did not intend to confer the power of destruction. In what does the case under consideration differ from the case last supposed? My slaves are no more my property than is my money. I have no more power over them when living, nor by will, when dead, than over my money.

When slaves are contemplated as property, (and in no other light can a Mississippi court contemplate them,) the manumission of a slave is as distinctly the destruction of property, as is the casting of money into the ocean.

If the general testamentary law, in its true spirit and proper judicial construction, does not confer the power to defeat the rights of my heirs, by causing my executors to throw my property into the ocean, how does it confer the power to manumit my slaves?

No distinction can be resorted to but this: It may be said, that to cast my property into the sea, promotes no object or purpose of benevolence or humanity; but to manumit my slave, is to do a humane and benevolent act. This distinction will appear well enough, and consistent with the principles of the institution, whose organ he is, if taken by an officer of a northern abolition society. But coming from a Mississippi court, speaking the language of those laws, whose organ he is, it would sound very strangely. Slavery is a cherished institution of Mississippi.

Founded in her constitution and laws, guarded, protected and defended by the spirit of her institutions, approved by her citizens, and its continuance interwoven, not only in the web of her prosperity, but almost of her existence, her interest, her feelings, her judgment, and her conscience, all alike conspire to sustain it.

But if the holding my slave is not opposed to humanity and benevolence, my manumitting him is no act of humanity or benevolence; for my act can only be an act of humanity, if by it he is relieved from a condition to which humanity stands opposed. It cannot be said to be an act of liberality or generosity when I manumit by will, for I have kept him as long as I could enjoy him.   As well may it be said, that my cutting my throat is an act of liberality or generosity to my children, to whom my estate by that act of mine descends.

Can a court of Mississippi, the oracle through which her laws speak, and who are bound to utter nothing but the spirit of those laws, declare in the name and for those laws, that her policy is founded in inhumanity; that the judgments of the courts shall favor emacipation, because humanity and benevolence are promoted by putting an end to slavery?   To take this distinction, is to strike at the institution itself.

As far as the interpretation of laws is to be influenced by the genius and spirit of the government whose laws they are, and to strengthen, support, and maintain the policy of the state which enacted them, (and all laws should be interpreted to this end,) the laws of Mississippi must be construed in favor of slavery, that being the policy of the state; and the notion that philanthropy and emancipation are at all kindred ideas, must be discarded.

Having shown, in the preceding remarks, what is the nature or quality of the dominion over property, that a man may exercise by will, that it is of the nature or quality of a law in his particular case, repealing the law of inheritance, by substituting the person or persons of his election to succeed to his property, instead of those selected by the legislature, as the heirs or distributees; and that it was not of the nature or quality of unlimited legislative power, extending to the re-enacting of the law of nature, and again rendering his property *publici juris*, nor of the nature and quality of the power of destruction, and that the will of Ross is

either of the nature and quality of an'exercise of power, to render his slaves common property, to be seized on by any whose laws do not forbid the slave trade, or if not so, of the nature and quality of the power of destruction of property; it follows irresistibly, that the statute law, conferring this right to exercise dominion by will, does not embrace the present case; and as he cannot derive the power from the law of nature, nor from the common law, nor from the statute law, his will is invalid for defect of testamentary ability in him, there being no law from which the power can be derived, unless from one of these.

Although I might here safely conclude the present controversy, as it seems to me, past experience admonishes me not to repose too confidently on a single argument thought to be conclusive, I will proceed to notice in detail the arguments of my adversaries, and of the chancellor, so far as they have not been heretofore examined.

It has already been made manifest that the dominion over property after death, by will, is not indulged until it comes in collision with great principles of public policy. It is not necessary that it comes in collision with them, to invalidate a will; it is all-sufficient to produce this effect, that it does not pursue and carry them out. But if it was necessary to maintain, that the will in this case did come in collision with great principles of public policy, it is easy to show that it does so.

It is a great principle of public policy, of every state and nation, to preserve and increase wealth. With this principle of public policy there is no collision produced, when I say by my will who shall enjoy my property, when I die; but the collision is direct when I provide that it shall not be enjoyed at all.

Is it not part of the policy of Mississippi that her forests be subdued, and her soil rendered fruitful? Is not slave labor necessary to effect this object? and will not the removal of slave property to Liberia come in collision with this policy? Is it not part of the policy of Mississippi to support the institution of slavery? And although the Colonization Society is established to colonize on the coasts of Africa such free persons of color as may voluntarily go, or such slaves as may be manumitted by their owners, with a view to colonization, do not the members of that society look forward to the entire overthrow of African slavery, as an ultimate conse-

quence of their success, though not as an object or design of their association? Does not almost every number of the African Repository furnish ample evidence of this? And can any doubt but such is its tendency, if not its design?

Is it not necessary to maintain the institution of slavery, and to rescue our wives and children from the horrors of insurrection and servile war, that we hold out no inducements to abolitionists and emancipators to visit our state, and inculcate and disseminate their principles? And can we more effectually invite them to come amongst us, than we will do by a determination that if they succeed in making such impressions on the minds of our aged and infirm citizens, or others in the prospect of death, as to produce a will directing their slaves to be carried to Ohio, Indiana, or any other none-slaveholding state or country, they can thereby effect their emancipation?

Is it not part of the policy of Mississippi to protect her citizens against fanaticism in religion, and a morbid sensibility on the subject of slaveholding? And does it not war with this end to proclaim to the world, come here, all ye who seek the destruction of slavery, address yourselves to, and endeavor to disturb the consciences of our women, our old men, and others, whose sickly sensibilities are easily operated on. Impress upon them in the closet, and by the fireside, your false and unfounded tenets, of the sinfulness of slavery, and the peril in which their souls stand if they do not disinherit their offspring by emancipating their slaves! Declare to them that it is not our policy to continue slavery in Mississippi; that the evil we dread is the increase of free negroes, and that there is no obstacle in their way but may be readily removed by means of a provision, that the slaves be removed from the state; and you have virtually made that proclamation, and thrown open the doors to the abolitionists, and invited them to walk in, and revel in the destruction of the slave property of the state.

Does not all history, does not the legislation of all nations, admonish us of the safeguards necessary to be thrown by law around property to protect it, when in possession of the infirm, the diseased, and the dying, against the varied assaults of those who lie in wait for the weak, and prowl around the bed of the expiring?

If to settle a principle fraught with all these evils does not come in conflict with great principles of public policy, it is difficult to perceive what would produce the collision.

The next position of the adverse counsel is, " that it may be safely laid down as an incontrovertible proposition, that a person may, unless prohibited by law, direct in his will any disposition of his property, after his death, which he could have legally made during his lifetime."

The converse of this proposition I have already contended for, and have argued that a man can make no disposition of property by will, unless such disposition is authorized by law; that he who exercises this power must do so in virtue of law conferring it, and not because there is no law prohibiting it; and I have also shown that to dispose of property is to transfer dominion to another.

The argument then proceeds thus: " It cannot for a moment be contended, that without an express law prohibiting it, and such a law would be unconstitutional, any person would not have the right to carry or send any portion of his personal property out of the state of Mississippi, to Africa or elsewhere, provided the rights of third persons were not infringed thereby."

Connecting this with the preceding proposition, the conclusion intended to follow, is, that the slaves may be sent to Liberia, by will.

The argument of the chancellor proceeds upon the same ground. I will, in a few words, refute it. Passing by the question of constitutionality, I admit the latter proposition, and will show that the same reason, precisely, which proves that I may carry my property to Africa whilst living, also proves that I cannot do so by will, when dead.

The reason why I may lawfully thus carry my property is plainly this: By the law of nature, I have a right to enjoy my acquisitions so long as I live. That law knows not states or nations; it existed before they were; and only relates to and contemplates man as a citizen of the world, having the power and right of locomotion. In virtue of this law, then, I have the right to carry my property where I please, because the municipal law is, on this subject, silent.

By the law of nature, my dominion over my property ended

upon my death.. By that law I could not, by will, send my property to Africa, nor can I now do so for the same reason; that is, because the municipal law of the land is, on this subject, silent.

We, then, clearly perceive that the reason of the diversity is, that the law of nature conferring the one right and not the other, and the municipal law being silent on both, I have, by law, a right to do it in the one case and not in the other, because there is a law conferring that right in the one case, and no law conferring it in the other.

If the chancellor is right in his position, that an express law prohibiting the living man from carrying his property to Africa would be unconstitutional; and if he is also right in his position, that there is such a right also vested in him to do so by will, and that these rights have the same foundation, it seems to result, of course, that a law, expressly enacted, forbidding the exercise of such power by will, would also be unconstitutional. . Yet, a little further on, he informs us that this right is subject, of course, to be limited and controlled by the municipal regulations and policy of the country; and, what is more remarkable, that it is so subject like *all other rights.* There must be a flaw here somewhere, and it seems to me that the whole argument is unsound in all its premises, and, conceding the premises, false in its conclusion.

The argument contains a proviso as to the right of the living to carry his property to Africa. He may do so, "provided the rights of third persons are not infringed thereby." This proviso includes, of course, the concession that he has no right to carry his property if the rights of third persons are infringed thereby. The concession alone, if correctly made, determines this cause against the appellees.

The appellants, as has been before shown, in the outset of this argument, had, even in the life of the testator, as his descendants, brought into being by his act, a right to inherit his estate, which "seems to have had its foundation higher than any positive institutions;" a right which he could not have deprived them of, according to Rutherforth, without a failure to perform a duty so highly incumbent on him, that, had he given his estate to others, the civil laws of the state would do well to step in and set his will aside.

He died without giving his estate to any one, only directing his executors to send his slaves to Liberia, and to sell the residuum of his estate for the benefit of his slaves.  He has neither devised the legal estate nor vested the present beneficial interest in any one recognized by the laws of Mississippi as capable of taking.  On his death, the legal estate in his lands, and it is conceived in his slaves also, passed to his heirs at law, the complainants.  If the legal estate in the slaves vested in the executors, it is but as trustees, and the law makes them trustees for the heirs; for slaves, as such, cannot be *cestui que trust.*  If they remain in Mississippi they remain slaves, and the slaves of my clients.

The very object of our filing the bill was to prevent that removal which would "infringe" our right.  Somebody must have the right now.  The executors have it not; the will does not even profess to give it them.  The colonization society has not; they are only to superintend the removal, &c. if it take place.  The slaves have it not; they cannot take or hold or acquire rights to property whilst slaves.  The right is, then, in the appellants, under the statute law of this state, and will in them continue, unless this, their now vested right, is infringed by the act of the executors.

The next position in the argument is, that "the right of the master to manumit his slaves is a natural attribute of the condition of slavery."

Whatever others may be enabled to do, I freely admit that my mind has not sufficient compass to grasp the idea of a natural attribute of an artificial relation, without aids that, as yet, I have not received.  Conceding it, therefore, to be true—for I cannot controvert what I do not understand—I can readily perceive that the right of a master, while living, to manumit his slave, (and when dead he is not master,) is a very different thing from the right of the master, when living, to make a will which shall have the effect of producing manumission after his death.  Whether he has this right, is the question in debate, and that question has already been discussed.

The next step in the argument is, that "this right of manumission, when unrestrained by positive municipal regulations, has

ever been held, in all countries where slavery has obtained, as one of the most valuable and important powers of the master."

If this right, supposed in the argument to be a natural attribute of the relation, has ever been esteemed as one of the most valuable and important powers of the master, it is somewhat surprising that it should be restrained by municipal regulations; and in what does the value and importance of this right, as it relates to the master, consist? I do not think my right, if I have it, to burn my house or throw away my corn, a right of any value or importance. The right and power to retain my property, whether it consists in houses or slaves, I appreciate as valuable and important, but I do not prize the other as of any value whatever.

In what page of history do we read of the value and importance of this right to manumit slaves? We have a right to ask for the evidence.

In England the villeins were manumitted on very different grounds; to break down the power of the barons, and build up the throne. In Rome and in Greece it was principally to supply soldiers for the benefit of the government. But if in every other country it has been so considered, it weighs nothing in Mississippi, unless her laws so consider it, for we are before a Mississippi court, claiming under Mississippi law, and founding our right in the considerations of no other state or nation.

Besides, this is not a case of a master manumitting his slaves by sending them to Liberia; but the case of a master who retained his slaves, as such, until the moment of his death, but who attempts to prevent their becoming the slaves of his heirs.

It is next asserted that "in all the states of this Union, where this institution has prevailed, the master has ever been allowed, in the absence of statutory limitations, to manumit at pleasure by will, deed or otherwise." No evidence is given or referred to, in support of this position, and it is believed not to be accurate. On the contrary, it is believed that in no state in this Union has it so been regarded, unless in those in a state of transition from slave holding to non-slave holding states; and that in every state whose policy is that of Mississippi, the question has been, is there a law giving power to manumit? and not, is there a law denying it?

The constitution of Alabama provides, "that the legislature

shall have power to pass laws to emancipate them, (slaves,) saving the rights of creditors, and preventing them from becoming a public charge." Aikin's Dig. title Con. p. 44.

The legislature has never acted on this subject, and there is no law limiting or forbidding the exercise of this power by the master. I have searched and inquired in vain for any evidence or information that the practice is, or the right is, considered as existing in that state, to emancipate either by will or by deed. But the practice and the only practice is, to apply to the legislature in each particular case, for an act authorizing the master to emancipate. That such enabling acts have generally, if not universally been rejected, and, notwithstanding the anxiety of many masters to effect their object, neither wills or deeds of manumission have been recognized as legitimate or effectual.

This statement must be understood as only made from information derived from lawyers formerly of that state; of it I have no personal knowledge, and have seen nothing published relating to the subject. If, however, it should be deemed of any importance, satisfactory information may be obtained.

In Kentucky there is no law abridging the right of the master to manumit. On the contrary, the first provision was thus:

"It shall be lawful for any person, by his or her last will and testament, or by any other instrument of writing, under her or his hand and seal, attested and approved in the county court, by two witnesses, or acknowledged by the party in the court, (of the county,) where he or she resides, to emancipate or set free his or her slave or slaves, who shall thereupon be entirely and fully discharged from the performance of any contract entered into during his servitude, and enjoy his full freedom as if they had been born free." 2d Dig. by Littell & Swigert, 1155.

All subsequent legislation has been in extension of this power. Before the passage of this statute, the power to make wills and deeds was as fully enjoyed in Kentucky as in Mississippi it now exists. The statutes of the two states are literally transcribed from the same statute, that of Virginia, which Virginia law was, by adoption, the law of Kentucky, even before she specially adopted it, she having been a part of the state of Virginia, and

having adopted her statute law, and the common law, together with the English statutes, to the 4th of Jac. 1.

Yet, in the absence of all law prohibiting manumission, the express provision before copied was deemed necessary to confer the ability to manumit by will, even where the testamentary power existed in its greatest amplitude. In that state, the question has always been, has the act done by the owner conformed to the foregoing,. or any subsequent enabling statute? And not, is it an act within the prohibition of a disabling statute? Such was the case in Donalson *v.* Jude, 2 Bibb, 57. Beall *v.* Joseph, Hardin, 52, in which case the court expressly say, "the right to freedom can only be obtained by deed in writing, or last will and testament of the owner, duly authenticated and recorded." See also Clark *v.* Bartlett, 4 Bibb, 201; and Talbott *v.* David, 2 Marshall, 603. A stronger case cannot be conceived of than this last. There the act was done in open court, expressed on the record. It was in that court which, by the statute before referred to, had jurisdiction to receive the proof or acknowledgment. Yet it was not even insisted by the very learned counsel who argued that case, that this act of record was a valid manumission, but only that it was evidence of the execution of a deed pursuant to the statute, and the court decided that it was not even evidence of a deed, much less a valid emancipation.

I will not idly waste my own time or the more valuable time of the court, by referring to the numerous cases, all showing that the burthen has rested on those who assert the validity of the instrument of showing law which gave it validity, and not on the adversary, to prove the reverse. This is but the universal rule of jurisprudence, not merely the general rule.

Having met and attempted to refute my adversaries, so far as they rest the case upon their own reasoning, I will now proceed to inquire how far they derive strength from the views of the chancellor. He says:

"It was assumed as a general principle, that the right to dispose of property by will is more restricted and limited than the right whilst living. I cannot assent to this position thus broadly laid down: it is true that the right to dispose of property by will is a civil right, or in other words, a right derived from the law, but

the source of its derivation does not imply that it is less comprehensive than the living right. A will is defined to be the disposition which one desires may be made of his possessions or property after his death. Justice Blackstone, second volume of his Commentaries, page 11, says, "the power given to a dying person of continuing his property by disposing of his possessions by will, is a kind of secondary law of nature." The word property is here evidently used as synonymous with the word dominion, a power as contradistinguished from the possession or the thing itself. I think it will sufficiently appear from this reference that, as a general rule, the right to dispose of property by will, is as broad and comprehensive as the right of disposition while living. The distinction attempted to be taken between the two modes of doing the same thing, so far as the policy of this state is concerned, is not very readily perceived. I conclude, then, that whatever would be a legal disposition of a person's property while living, would be equally lawful when disposed of by last will and testament, unless there is something in this latter mode of conveyance which *ex vi termini* not only restricts the party's rights, but necessarily implies illegality, or unless there is an arbitrary and inflexible rule of municipal law by which the distinction is taken and sustained."

This embraces the whole of the chancellor's reasoning upon that branch of the subject which I have been endeavoring to discuss, and to every idea which can be extracted from it, I most respectfully object, as unfounded.

It was not assumed as a general principle, that the right to dispose of property by will, is more restricted and limited than the right whilst living. It was assumed that all power was either conferred by the law of nature, or conferred by the laws of the land. It was then argued that the law of nature did not confer the power to exercise dominion over property longer than the possessor lived, and authorities were adduced to sustain even this evident truth. It was then assumed that the laws of this land consisted of common law, and of written law only, and argued that as the Colonization Society claimed under an act not authorized by the law of nature, they could not succeed, unless the common law or the statute law conferred the power on the testator, to do

the act under which they claim. That it lay on them to prove that by common, or by statute law, the power was conferred, and not on us to show that the power was denied, or taken away. That they must show that it at some time existed, before they could call on us to show, that a law had been enacted depriving testators of such power.

The counsel who argued the case, feel it due to themselves to say that they never contended, or supposed, that the source of the derivation of the power to make a will did "imply that it was less comprehensive than the living right" of disposition. Humble as they admit their logical ability to be, they readily perceive, that such an implication would by no means arise from the fact, that, the ability to make a testamentary disposition was conferred by human laws. But they did insist (and intended to contend for nothing further, as the result of its being a conventional right,) that it devolved on the defendants to prove the right to have existed, or to have been conferred, and not on us to prove that municipal law had denied it.

The counsel respectfully contend, that Justice Blackstone, second volume of his Commentaries, page 11, does not say "—the power given to a dying person of continuing his property by disposing of his possessions by will, is a kind of secondary law of nature," nor does he say so any where else, and even if he did, it is conceived very few would on reflection and an understanding of the subject, concur with him. The passage supposed to be alluded to by the chancellor, runs thus : " All property must therefore cease upon death, considering men as absolute individuals, and unconnected with civil society ; for then by the principles before established, the next immediate occupant would acquire a right in all that the deceased possessed. But as under civilized governments, which are calculated for the peace of mankind, such a constitution would be productive of endless disturbance, the universal law of almost every nation (which is a kind of secondary law of nature) has either given the dying person a power of continuing his property, by disposing of his possessions by will ; or in case he neglects to dispose of it, or is not permitted to make any disposition at all, the municipal law of the country then steps in and declares who shall be the successor, representative or heir of the deceased,

that is, who alone shall have a right to enter upon this vacant possession, in order to avoid that confusion which its becoming again common would occasion." Does this convey the idea that " the power given to a dying person of continuing his property by disposing of his possessions, by will, is a kind of secondary law of nature?" We can extract from it no such meaning.

This is conceived to be the sense of the passage : The laws of nature embrace all nations; almost every nation has by laws of inheritance, escheats and wills, provided a successor for the property of deceased persons, and by reason of the almost universality of such provision of a successor, it may be said to be a kind of secondary law of nature that property shall not again become common. That he did not intend to say, " the power given to a dying person of continuing his property by disposing of his possessions by will, is a kind of secondary law of nature," is evident; the word " which " cannot refer to testaments or testamentary capacity, for neither the one nor the other has been yet alluded to, but it evidently refers to the immediately preceding words, to wit: " the universal law of almost every nation," which universal law of almost every nation has provided a successor by either giving the right to make a will, " or by inheritance, in case no will is made, or the possessor is not permitted by law to make any disposition at all." In the next paragraph, he says: " The right of inheritance or descent to the children and relations of the deceased, seems to have been allowed much earlier than the right of devising by testament;" and again a little further on, in page 12, "when it (property) became inheritable, the inheritance was long indefeasible, and the children or heirs at law, were incapable of exclusion by law," and again " with us in England till modern times, a man could only dispose of one-third of his moveables from his wife and children." How then could it be likened to the laws of nature ? The fact is, that this phrase of Blackstone, " a kind of secondary law of nature," is one of the few expressions to be found in that very accurate and learned author which conveys no idea to the mind. I defy any man to fix a definite and distinct idea to, and give a definition of, " a kind of secondary law of nature." We can see what the author meant, by resorting to the preceding words, but otherwise the words are mere empty sound.

Blackstone himself considered it of no import, and therefore throws the words, " which is a kind of secondary law of nature," into parenthesis, as not affecting the sense of, or important to, the paragraph, and yet the chancellor lays hold of this loose parenthesis, thrown into a sentence rather by way of flourish than to illustrate the subject, and which evidently has no reference to the positions which Blackstone was maintaining, and makes that loose expression the turning point of his opinion.

The chancellor continues, "The word *property* is here evidently used as synonymous with the word dominion or power, as contradistinguished from the possession of the thing itself." Let us, then, substitute the synonym for the word property, and see how the chancellor's reading of Blackstone will stand. It will be, "the power given to a dying person of continuing his dominion or *power*, by disposing of his possessions by will, is a kind of secondary law of nature." This is a new idea—that I continue my dominion or power by disposing of my possession. Yet such seems to be the doctrine. In old times we thought that by disposing of our possessions we lost dominion or power over them. To say I continue my dominion longer than I continue, is paradoxical. It may, by a figure of speech, be so asserted, when we wish to convey the idea that I may exercise a power over property whilst living, which will affect that property, or the tenure by which it is held, when I am dead; as, that I may, by will, found a school upon my property, and give laws to the charity. But, to make it answer the chancellor's purpose, we must take it literally, that a man, by making a will, continues his power of disposition; continues his dominion or power of emancipation by carrying the slaves to Liberia. For they are now slaves. They cannot be slaves without owners. If the ownership or dominion is not in the deceased captain Ross, the testator, but by his death passed from him, it passed to some one, either by force of his will or by operation of law. He did not pass it by his will; it must, then, have passed by law, if it does not remain with him after his death. If it passed by law, it passed to the complainants, his next of kin, and if in them, the executors and trustees cannot, as representatives of the dead, defeat the right of the living. Therefore, to sustain the chancellor's view, we must take it literally, that by

making a will, a man may continue his dominion, power, owner-ship, or beneficial title.

The truth of the matter, however, is, that Blackstone never intended to communicate any other idea, by the expression referred to by the chancellor, than this, that, by making a will, a man might so dispose of his property as to prevent its becoming again liable to be seized upon and vesting in the next occupant, that he might select and appoint his own successor. The whole tenor of the chapter proves this beyond a doubt.

The chancellor continues, "I think it will sufficiently appear from this reference, that, as a general rule, the right to dispose of property by will is as broad and comprehensive as the right of disposition when living."

With all due deference, it is conceived that, according to his own version of Blackstone, it does not appear at all that the right is less extensive, as extensive, or more extensive; it only appears that a right of disposition exists, but how broad or how narrow, how restricted or how extensive, are subjects untouched. But when we look to Blackstone himself, we find that the passage has no particular reference to the laws of any nation or kingdom; but to what he, in general observations, predicates of "the universal law of almost every nation," and the law of England is not spoken of by him until several paragraphs have followed that referred to by the chancellor.

The subject discussed by Blackstone only called his mind to point to the various means adopted by civil society to prevent property's again becoming common; he does nothing more than to enumerate them, and assign the reasons that gave rise to them, and when, at page 13, he speaks more particularly of the laws of England, his expression is, "The positive law of society, which is with us the municipal law of England, directs it to vest in such person as the last proprietor shall, by will, attended with certain requisites, appoint; and, in defect of such appointment, to go to some particular person, who, from the result of certain local constitutions, appears to be the heir at law."

From this and other passages, it has already been shown that the power to make a will is only the power to appoint a successor, and it is only again introduced to show the erroneous construction

of the chancellor, when he attempts to deduce this power, in his broad sense of it, from the passage referred to by him.

"The distinction attempted to be taken," says the chancellor, "between the two modes of doing the same thing, so far as the policy of the statute is concerned, is not very readily perceived." No such distinction was attempted to be taken, as a distinction between the two modes of doing the same thing. The distinction was a distinction between the *power* or *ability* to do the thing by one mode, and the power or ability to do it by the other, and this distinction it is hoped *this* honorable court will very readily perceive. And that there is a distinction between what I may do whilst living, and what I may do by will, and also that the power of disposition by testament is not commensurate with the power of living persons to contract, act and dispose of property, is not only manifest from the general reason and policy of the law, independent of any recognition of such distinction by jurists, but the learned of all communities have recognized it. Maintaining this distinction, the learned and talented D'Aguesseau, speaking of the difference between contracts and testaments, proceeds as follows: "But so far is it from being novel or unjust, that we think it may be said to be as ancient as the system of jurisprudence itself, and that without it, it would be impossible to sustain several of the most inviolable laws. We shall not attempt at present to prove it by a long enumeration of all the cases in which it is clearly established; we shall only mention two, which are known to every body, and demonstrate in an invincible manner.

No body is ignorant that even pupils, before the age of fourteen, may make a valid contract, provided it is with the assent of their tutor. We do not say, that the tutor can oblige himself in their name; we say, (and it is a principle known to all who have only read the Institutes of Justinian,) the pupils might oblige themselves with the assent of their tutor, yet they could not make a testament. But not to travel out of the French jurisprudence, can any body doubt that contracts made by minors are good in themselves—that they produce a legitimate obligation—and that, until they are destroyed by letters of rescission, they are to be executed as acts passed by persons of full age? They may engage their property by all kinds of contracts; the laws of the church

and the state regard them as capable of effectually contracting the most important, the most solemn, and the most inviolable of all engagements, such as marriage and religious profession, yet at the time that it is permitted to them to dispose not only of their goods and their fortune, but also of their person and condition, the same law declares them incapable of disposing of their effects by testament.

Let us add to this first example another proof of this same distinction, which is not less certain or less convincing; a person may engage by the ministry of a procurator; and when the procuration is general, he so completely adopts the credit of the person in whom he confides, that without knowing it, without expressly intending it, he enters into all kinds of obligations; but can any body contend that it is possible to make a testament by procuration? and whatever confidence a testator may repose in the probity and understanding of his counsel, could he subscribe to a law not made by himself?

The testament, if you please, shall be wise, reasonable and full of justice and equity; the testator shall even have approved it before hand, by permitting his counsel to make it; the disposition is null, because a testament ought to be not only a judicious act—it ought essentially and necessarily to be the production of the judgment and reason of the testator himself.

This is not, then, one of those subtle distinctions repugnant to natural reason, and only supported by the mere authority of positive law. We might say, that although it is written in every law, it is a law previously ordained, a law of reason itself, and therefore it is universally received wherever there is any idea of jurisprudence. But what is the natural difference that produces this distinction between contracts and testaments? We conceive there is no great difficulty in resolving this question. It is essential to human society that there should be contracts. It is not necessary that there should be testaments; never was there a community subsisting without the aid of some engagement. There were many which for a long time refused their citizens the authority of making testaments. The foundations of civil society, of commerce, of police, of government, would be overturned if it was rendered difficult to contract engagements; on the contrary, the

commerce, the government of states, might subsist without testaments.

The faculty of contracting is conformable to natural law, to the law of nations, to civil law. The liberty of making testaments is an invention of the law of nations, authorized by civil law, but appears contrary to the law of nature, which by death deprives a man of all the rights that he could exercise over his property. Contracts are always favored; testaments are often the reverse. Such are the natural characters which distinguish contracts from testaments. Shall we then be surprised if the laws have permitted mankind to dispose of their property more easily by a contract than a testament? 2 Pothier, 467–8–9.

At page 509 and 510 of the same volume, this eminent jurist again adverts to the same subject, and says: "The law which substitutes a testator in its place, which invests him with the character and power of a real legislature, which grants him the right to change, to discompose, to abrogate the natural and favorable order of legitimate successions, requires at the same time from him both a capacity proportionate to the importance of his ministry and a plenitude, and, if we may so express ourselves, of a superabundance of will; and, therefore, it renders him capable of all kinds of contracts, previous to impressing him with capacity, necessary for making a testament.

Every body knows that persons under the age of puberty, but approaching to that age, may contract with the authority of their tutors; but whoever conceived that the presence and authority of their tutor could render them capable of making a testament?

Minors contract amongst us with the hopes of restitution, but they make a valid contract. This is not all; the laws of the church and of the state give them the power of engaging themselves by the most solemn and indissoluble ties; and at the same time that the law permits them to dispose not only of their fortune, but of their state, and their liberty; whether by marriage or religious profession; the same law declares them incapable of giving their effects by testament."

"And what is the reason of the two differences between contract and testament? It is founded upon the most pure sources of sound jurisprudence. We shall only point at them in passing,

that we may enter upon that which more nearly concerns the real state of the cause.

It is essential to human society that there should ·be contracts; it is not necessary that there should be testaments. There are many flourishing states which have long refused to their citizens the right of making a testament. Was there ever any which deprived them of the faculty of contracting all engagements?

The faculty of engaging is conformable to every kind of law, the law of nature introduces it, the law of nations augments it, the civil law perfects it.

The faculty of disposing by testament is the nature of civil law, or at most of the law of nations; but it is contrary to the law of nature, by which death deprives a man of every right over his property.

·" The entering into contracts is favorable, and almost always accords with the law; testaments are often odious, and every testator begins by thinking himself more wise than the law itself; in fact he ought to be so, when he has the right to abrogate it.

After this, is it astonishing, if the laws have granted a liberty of entering into a contract at an earlier period than that of making a testament, if they have willed that contracts shall be more favored, more common, more easy to make than testaments, if they are content with a moderate capacity for the one, while they require a great one for the other; lastly, if the contract can be supplied by a substitute, while a testament never can." ·2 Pothier, 511.

Although this reasoning is in a case respecting the capacity necessary to making a testament valid, it proceeds upon general fundamental principles of law and jurisprudence, applicable to the whole law of testaments, and most remarkably coincides with and strongly sustains, both by the high authority of the most able and renowned jurist from whom it proceeds, and its own force and cogency, the general view which I have attempted to take. To attempt a detailed application of the several parts of it which avail me would be tedious, and is thought unnecessary, as your honors will readily supply the omission by your own reflection. Yet I cannot forbear one or two notices of its application.

Instead of concurring with the chancellor that the right of disposition by will, and by act or contract are co-extensive, he pro-

ceeds exactly on the ground I have taken, declaring that the distinction between contracting when living, and disposing of property by testament when dead, " is not one of those subtile distinctions repugnant to·natural· reason, and only supported by the mere authority of positive law," and adds in reference to the distinction: " we might say that although it is written in every law, it is a law previously ordained, a law of reason itself, and therefore it is universally received wherever there is any idea of jurisprudence." He maintains that the power to make a testament is the power to repeal the law, by changing the legitimate and natural course of succession established by the wisdom of the law itself, and such it evidently is. The wisdom of the law has provided that the next of kin shall succeed to the estate of deceased persons, but for reasons assigned by Blackstone and before noticed, it was thought politic to give to the owner the power to appoint by will his own heir or successor, substituting the successor of his choice for the successor appointed by the wisdom of the law. How can it be reasonably inferred from this, that the law making power when it conferred on the owner the power of defeating its own selection of a successor, by appointing one to succeed him, intended also to confer the power of declaring that no one should succeed him. This would be against reason; there was a motive to induce the making a law, that the owner might select the person who should enjoy his estate; there was no motive to provide by law that it should not be enjoyed at all. On the contrary, every motive existed to deny the power to withdraw property from the uses to which it was adapted. The whole tendency and aim of legitimate legislation is to preserve property for the benefit of man, not to destroy it. In some communities, slaves have been so far regarded as an exception, as to induce the passage of laws authorizing a master by will to manumit, and thus to reduce the amount of property. This has not been done in Mississippi, and consequently, if the right to appoint a successor by will does not confer the right to provide that horses, or household goods, shall not be held as property, it does not confer the right to make a disposition of slaves which shall cause them to cease to be property.

This view of the subject will derive great aid from our keeping it constantly in the mind, that there exists a distinction founded in

reason and nature, between my right to go with my property wheresoever I choose, and my directing by will that it shall be carried after I die.   The law of nature knows nothing of states or nations.   Its existence preceded the formation of distinct communities; it only regards man as a citizen of the world, confers on him the right and power of locomotion, and under that law, he has the right to hold property so long as he lives, and to go with it where he chooses.   The municipal law did not confer this right or power, nor has it abridged it.

" The faculty of disposing by testament is the nature of civil law, or at most of the law of nations; but it is contrary to the law of nature, by which death deprives a man of every right over his property."   We here see the fallacy of the argument that would prove that as the testator might go with his property to Liberia, while living, he might by testament effect the same after his death.

The law of nature gave him the right while living, and therefore he might do so, the laws of the land being silent.   The law of nature gave him no right to do so by will, and therefore he could not after death do so for the same reason, that is, the laws of the land being silent.

We point to the law which conferred the right on the living man, and that law denies it to the dead.   Let them, then, point to the law which confers the power on the dead, and abrogates the law of nature.   When this is done, and not until this is done, can we say with the chancellor, that, " whatever would be a legal disposition of a person's property while living, would be equally lawful, when disposed of by last will and testament," if, by the word disposition, he means the sending slaves from Mississippi to Liberia, there to be free.

The chancellor says, " The right to manumit a slave is perfect and undoubted at common law, by will, deed, or otherwise," and upon this assumption builds much.

I have already shown: 1. That no such right existed at common law.   2. That if it did, it was not the law of master and slave here.   3. That if it was, it overthrew the cause of the appellees.   In doing this, I necessarily refute the whole of the chancellor's argument, for it all rests upon his assumption of false premises, that is, that by the common law, this was a valid will, and

being so it remained good, unless repealed by the prohibitory law copied in his argument.

I will now proceed to the question, whether the statute does not prohibit this emancipation, even if independent of it the will would be valid. The chancellor having come to the conclusion that it does not, we must examine the argument by which he does so.

One of his positions is, that all statutes must be construed in reference to the common law, "for it is not to be presumed the legislature intended to make any innovation upon the common law, further than the case absolutely requires." If, when tested by the common law, the will would have been valid, and if, also, the legislature has, in the statute, used language so ambiguous that it is necessary by presumption to ascertain the meaning of the words, there would be something in this. But inasmuch as the common law had no effect of that kind, and further, as the words of the statute are as clear and distinct and free from ambiguity as the English language can make them, it is wholly unallowable to indulge in presumptions at all. In the very nature of things there can be no presumption. It is a well settled principle of law, that where there is no ambiguity there is to be no construction; in fact there is no room for it. It is a perversion of terms to call it construction.

Something is said about the reciprocity of the duty of obedience to the law, by the citizen, and of protection on the part of the government. To what end are laws ordained? to protect the dead, or the living? From whom do they require this obedience? is it from the dead, or from the living? If protection and obedience are correlatives, it follows, that where obedience is withdrawn, the right to protection ceases, and the dead do not obey the law. What are we thinking of when we talk of protection and obedience, in reference to human laws, and a man in his grave? and upon this idea of duty of protection due to him, who was a citizen, and is dead, by the most far fetched presumptions, in the very teeth of positive and unequivocal legislative prohibition, wrest from his heirs their rightful patrimony to bestow it on his slaves? What obedience is due from the appellants to that government which thus, through her courts, protects them?

Ross and Ross *v.* Duncan *et al.,* and same *v.* Vertner *et al.*

It is said that the counsel referred to decisions under the . mortmain act, to show the construction of our statute of emancipation. The counsel were very unfortunate, through the whole case, in not having made themselves understood in any part of it. They insisted that this statute admitted of no construction whatever, being wholly free from the slightest ambiguity. They referred to, and read decisions on the statute of mortmain, to show that the secret trust charged in the bill, in Mrs. Reed's case, and which stood admitted by the demurrer, would have the same effect in law that it would have had, had the estate been expressly devised upon the same trusts declared in the will; and in the course of the argument, when the subject was mentioned of legislative intention, it was said, that if the court were at liberty to go into conjecture as to legislative intent, and thereby control clear and express words, it was as reasonable to conjecture, that a part of the object of the legislature was to effect the objects intended to be effected by the statutes of mortmain, as it was to guess or conjecture that the only object was to prevent the increase of free negroes.

This would not have been adverted to now, but it is considered necessary to protect the humble reputation of counsel from the consequence of being held up to this court and the public, as taking so many distinctions without differences, and as being so wholly deficient in discernment as they have, from want of distinctness subjected themselves to be censured with.

I come now to notice an argument which is supposed to lead "to a conclusion that cannot be resisted."

We are told, that after reading the title of the act, the first thing that strikes us with surprise upon reading the statute, is, that a provision in relation to last wills and testaments should have occurred under such a title, instead of under the more appropriate head in the same book, "concerning last wills and testaments." The mind is prompted to inquire, what necessary connection there is, between the right of making a last will and testament, and a statute "concerning slaves, free negroes and mulattoes."

"To which one of these distinct and several branches of legislative concern," continues the argument, "does the right of making a will fitly attach itself. Is it that part which relates to slaves, or

58*

that part which relates to mulattoes, or is it the third branch relating to free negroes, with which the right to make a will holds affinity? The surprise gives place to a clear perception of the reason of this apparently unnatural association of subjects, when we perceive that the provision in regard to testaments is exclusively directed to the right of manumitting slaves."

It does not appear to me to be a very surprising or unnatural association, that when the legislature are enacting a law on the subject of slaves, that we should find in it a provision respecting emancipation, not as the chancellor has it, a provision concerning "the right of making a last will and testament," when they were enacting a statute in which from its title, as stated in the argument, "the entire legislative policy of the country, with respect to these three classes of persons, is to be sought for," it seems rather natural than otherwise, that the legislative mind should have been somewhat directed to the subject of manumission. That a question would arise, may slaves be manumitted? and this affirmatively decided, that a second question might reasonably arise; how may slaves be manumitted? and in considering of this, there is nothing very unnatural in coming to the conclusion, that 1. It may be done by will. 2. In consideration of distinguished services. 3. To the state, or, 4. To the owner. 5. With consent of the legislature. 6. And "it shall not be lawful for any person being the owner" to emancipate them unless so done. Precisely this is the provision of the statute, and it does appear that such a provision holds some affinity with that branch of legislative concern which relates to slaves, and the conclusion can, without any great effort of mind, be resisted, that it is only part and parcel of the municipal policy of the country with regard to free negroes. And this may possibly be easily done, if we perceive that the right to make a will is one thing, and the power to manumit a slave, by will, is another. That the one is a power to continue property by assigning it an owner, whilst the other is a power to discontinue property by a provision that there shall be no owner.

There is another fact, which carries to the mind of the chancellor "the clearest conviction that the legislature intended the prohibition to extend only to cases of emancipation within this state,

where the slaves were intended to remain," and that fact is, that the section, after requiring the sanction of the legislature, contains also this provision: "nor until the owner shall have complied with the conditions specified in such act;" and this clear conviction is produced by this satisfactory reasoning, as far as I see its force.

Major proposition. "I presume, that the probable conditions which the legislature would impose in such case upon the owner, would be such as requiring of him bond and security, for the good behavior of the negroes, or against their becoming a public charge."

Minor proposition. "Although the colony of Liberia is an object worthy of all philanthropic encouragement, yet it is not to be presumed that Mississippi intended to extend her guardian care so far as to protect that colony, by bond and security, against the evils of pauperism, and breaches of the peace."

Ergo. An act of assembly, declaring in express terms that no owner of a slave shall manumit him, but in the manner therein pointed out, "extends only to cases of emancipation within this state, where the slaves were intended to remain."

And this logic is sufficient to disinherit my clients, and wrest from them probably more than half a million of dollars.

The last argument, by which it is proved that this statute does not extend to the case under consideration, is this: "The rule, that every contract, act, or agreement, is to be governed by the laws of the place, where the execution or performance is to take place, is one of universal application. The execution of the trust, in this case, according to the allegation of this bill, is to take place in Liberia. The laws of that place, then, according to the rule, must decide upon its legality."

And is the validity or invalidity of a will, executed by a citizen of Mississippi, domiciled in Mississippi, devising estate, real and personal, in Mississippi, to be tested by the laws of Liberia? We had thought that there was some difference between the cases of wills and contracts. But further; if this case is to be decided by the law of Liberia, may we not ask, what law of Liberia conferred on the testator the capacity to make this will, emancipating his slaves, and giving to them his whole estate, real and personal, or the proceeds of it? Upon the subject of the gift, in certain events,

for the establishment of a school in Liberia, I would only make one point in addition to those made and so ably discussed by the senior counsel in the case. Even if the statute 43d Elizabeth, was not repealed, this charity could not be enforced. Under that statute no foreign charity was ever established, where the same would have been void as a domestic charity. This is intended to be a charity for the education of free negroes in a foreign country. The courts of Mississippi would not establish it as a charity, for the education of free negroes in Mississippi, and therefore will not do so for their education abroad. The existence and promotion of the Roman Catholic Religion, at Rome or in France, comes no more in conflict with the policy of England, than does the education of negroes in Africa come in conflict with the policy of Mis· sissippi. The rule under the statute of Elizabeth is, that whatever our laws regard as a charity, our courts, pronouncing those laws, will establish as such, whether domestic or foreign. What our laws do not recognize as a charity, we cannot enforce, for our courts are only organs of those laws.

Comity is extended far enough, and as far as it can be lawfully carried, when we permit the wealth of the state to be carried to foreign parts, to sustain a foreign institution, for the benefit of. a class of persons to which we would extend the same at home. It does not extend to sending our wealth abroad, to confer benefits on a particular class, when we would not at home extend the same benefit to our own people of the same class. In no instance known has it been done.

Mr. Justice Trotter delivered the opinion of the court.

In considering this case, I have not deemed it necessary or proper to follow the counsel into the wide field of discussion upon which some of them have entered, nor to examine the elementary questions which have been raised and very ably argued. The doctrines which have been insisted on, as the foundation in part of the title of the appellants, have formed the topics of fruitful controversy with philosophers and jurists, and are not yet settled in the judgment of mankind. Perhaps they never will be, so far at least, as to command a universal assent. In view of these considerations, it is quite unimportant that this court should express

an opinion, and more especially so, since the question has been settled by the paramount authority of the legislative will; so that whether the title of the appellants as heirs at law of Isaac Ross their ancestor, to the property he possessed, be derived from the law of nature, or the positive constitutions of the society of which they are members, is quite immaterial to the present inquiry, since it is very evident they have the title by law, unless their right has been defeated by a valid and effectual disposition made by the deceased.

I shall therefore proceed to consider the question presented by the record, whether the provisions in the last will and testament of Isaac Ross, for the disposition of the slaves claimed by appellants, are legal and valid, so as to defeat the title of the heirs.

The will directs the appellees, as the executors of the same, to transport to the coast of Africa, such of the slaves of the testator, as shall elect to go; there to be settled in Liberia and remain free. Is this trust raised in the will authorized by law, or is it repugnant to any provision of the laws of this country, so that its execution may be rightfully restrained? It is urged by the appellants, that it is a will for the emancipation of slaves, and as such, is opposed to the law and established policy of this state. That there is a mode provided for the manumission of slaves in this country, and no other can be permitted; that slaves, in this state, are property, and the subject of absolute dominion, is an undeniable proposition, since they have been so constituted by direct legislative enactment. Hence it is equally evident that their owner may emancipate them or in any manner renounce his right upon the clear principle of having the power to dispose of his own property as he pleases. The ability to devise or bequeath all his property by last will and testament, is conferred upon the owner in general terms by the law of this state. Rev. Code, p. 32, sec. 14. It follows of necessity, therefore, that the trust raised in the will of Captain Ross is legal, unless there is something in the character of slave property which excludes it from the control of this general dominion or power; and this I take to be the true and real ground of our inquiries. For unless the law has imposed modifications or limitations upon the power of disposition in regard to slaves, which do not exist in relation to other property, the present

controversy must be considered as at an end. Considerations of policy might well justify legislative regulations as to the method of emancipation, as that it shall be done by deed or will sanctioned by the legislative authority in consideration of meritorious services to the master, or distinguished services to the state, and under proper guarantees that they shall not become a public charge. And accordingly the legislature have prescribed limitations in substance such as the foregoing upon the right of emancipation. The act of 1822, embodies these rules, and declares the policy of the state in relation to slaves, free negroes, and mulattoes.

If the will in this case provided for the manumission of the slaves in this state, it would then unquestionably be opposed to the principles of this statute, and could not be enforced. And it would be inoperative for the same reason that a deed or any other instrument for the same purpose, executed by the testator, would have been so. It is not then because the intention to manumit is expressed in a last will and testament, that it must be defeated, but it is because the policy of the state, which is declared in the act of assembly, is opposed to such intention in any form. No one can by his mere act, unsanctioned by the public authority, set his slave free in this country, either by will or deed. And hence what he cannot do himself, cannot be done by trustees. That which he cannot do by his own act whilst living, cannot be done by his executors when he is dead. No man can delegate to another a power which he does not himself possess. Capt. Ross could not in his lifetime by any instrument or act grant freedom to his slaves, as a boon to be enjoyed in this state. That would frustrate the policy of the statute, which is opposed to an augmentation of free negroes in the state; a result hazardous to the safety of the owners of slaves, and the security of the public peace. This I take to be the full scope and design of the statute. It may well be urged, therefore, as it has been in every the most forcible and ingenious form of argument, that the appellees cannot be suffered to execute the trust expressed in the will, assuming it to be a trust for the emancipation of slaves generally. But the question presented in the record, is not whether the testator had the ability to manumit his slaves without the consent of the legislature, but whether he possessed the power to send them to Africa there to

remain free. It is true that the freedom and happiness of his slaves appears to have been the object, an object he had power to pursue by any means not incompatible with the laws of this state. The act of transporting them to Africa, there to remain free, does not seem to be an act of manumission within the meaning of the statute, or its spirit or policy. No question has been made of the power of the testator to carry his slaves to Africa in his lifetime. Nor indeed was it possible to have raised such question without a manifest absurdity. The power to have done so, resulted to the testator as the owner of the slaves from his acknowledged right of absolute dominion. Having this power himself, it was certainly competent for him to employ another to do the same thing, or to direct it to be done by his executors, who are trustees to carry his intentions into effect. But it has been urged that the trust in the will was raised from a studious design to evade the restrictions upon emancipation which the policy of the state has imposed, and was a fraud upon the law. And this is really the substantial gravamen of the whole of the able and learned arguments which have been offered to defeat the execution of the will. But this general charge of fraud is assumed merely as an inference of law, from the character of the trust set forth in the will, not based upon any facts urged in its support. But this general way of imputing fraud to a transaction which is fair and legal upon its face, without reference to any extrinsic or collateral act, is not sufficient to defeat it. Nor was it upon this ground that the cases were decided, which have been relied on by the appellees in support of their title.

The case of Hinds *et al. v.* Brazeale *et al.* which was decided at a former term of this court, 2 Howard, 837, proceeded upon a state of facts very different from that developed in the pleadings in the case at bar. In that case, Elisha Brazeale, the testator, left his residence in Mississippi, and carried the slaves in controversy with him to Ohio, and there executed a deed of manumission, when he returned with them to his home in this state. His will, subsequently made, directed their manumission according to the deed before executed in Ohio, and assuming them to be free in virtue of the deed, devised all the property of the testator to

them. The deed of emancipation was held void, because as a contract for freedom it was to be executed in Mississippi, whose laws and policy forbid it in the mode then attempted, and because the farcical excursion into Ohio by the testator, his immediate return into this state with the slaves to his former residence, and continuing there as a citizen up to the period of his death, with the other circumstances, demonstrated his intention to evade the laws of the state and commit a fraud upon their provisions. "It is a settled and sound principle," says the judge who delivered the opinion of the court, "that no state will enforce a contract made by its citizens elsewhere in violation and fraud of its laws." This is the general principle, and the rules of national comity are not to be enforced, or cease to be binding when the execution of the contract is forbidden by a great principle of state policy. But how can the application of the doctrines of that case be invoked to restrain the execution of a trust for the *bona fide* transportation of slaves from Mississippi to Africa, there to remain free? That case went on the ground expressed by the court, that the deed of emancipation having been made in Ohio, in pursuance of a scheme planned and executed to evade the rigor of the laws of this state, was to be treated as a deed made in this state and to be executed here, and therefore clearly void.

It will not be contended, however, that the testator had not a right to take the slaves to Ohio, and leave them there in the enjoyment of freedom, according to the constitution of that state. Placed thus beyond our limits, their freedom could not be the subject of animadversion by the municipal laws of Mississippi, whose rigorous police regulations on this subject, were designed for the security of slave owners in the state, against the dangers of too great an increase of free negroes, whose example and whose means too of sowing the seeds of mischief, of insubordination, perhaps of revolt, amongst the slaves in their neighborhood, was very justly to be apprehended and guarded. It is not the policy of Mississippi to augment her slave population. In her written constitution, she has spoken her will in unequivocal language, and the fiat there made of her future policy has been seconded by the sternest legislative sanctions.

As the case of Hinds *v.* Brazeale decided the deed of emancipation to be void, on the ground that it was to be considered as a deed made in Mississippi, so the case so much relied on by the appellant of Haywood *v.* Cravens's executors, 2 N. C. Law Rep. 557, decides the trust created by the will in that case to be void under the statute of North Carolina, *where* the trust was to be executed. The will gave certain slaves to the executors, in trust, to have them emancipated and set free by the laws of that state. But by the laws of North Carolina the executors had no such power, and, as it was a bequest of emancipation, to *take effect* under the laws of the state, it was properly enough held to be void. And the other cases will be found, upon examination, to relate to bequests of a similar character, or to contracts whose execution are forbidden by the laws of the state. I have not been able to procure all the cases cited by the counsel for the appellants, but feel satisfied, from the principles established in those which have been examined, that the views above presented are not shaken in any of them; and more especially since they are so fully sustained by the cases of McCutchen *v.* Marshall. 8 Peters, 285; 2 Call's R. 319, 357; 8 Lou. R. 475; 11 do. 499; 14 o. 410;d 6 Yer. 119; 7 do. 552.

Being thus clearly of opinion that the trust created by the will of the testator is valid, it is not considered necessary to examine the other questions which have been raised on the argument. The decree of the chancellor must be affirmed, with costs to the appellees.

Since the opinion in this case was delivered, I have met with the case of Frazier *et al. v.* Frazier's executors, which was decided by the Court of Appeals in South Carolina, as late as the year 1835, and reported in 2 Hill's Ch. R. 305. The identical question which was raised under Mrs. Reed's will arose in that; was fully discussed at the bar, and received the most careful examination of the court, who held the trust to be a valid one, which the executors might be compelled to execute.

The bequest in the will of John Frazier, which gave rise to the controversy between the heirs and the executors, was, that the slaves of the testator should be hired out during the life time of

his widow, and that after her death the whole of them should be set free by his executors, &c. "The interest of the money is to enable them, with the assistance of government, to go to St. Domingo, to be colonized, or to any port that they, with the government, may choose." Upon the death of the widow the executors seized the negroes, with the view of carrying the will into effect; and a bill was then filed by the next of kin, claiming the negroes, &c.

The act of 1830, of that state, provides "that no slave shall be emancipated but by act of the legislature." The court say, that, although the provision is general, and might seem to prohibit emancipation, out of as well as within the state, by a citizen, yet such construction would be manifestly contrary to the spirit of the law. "The evil was the increase of free negroes in the state by emancipation." "The removal of slaves belonging to citizens of the state, and their emancipation in parts beyond her territorial limits, was no injury to her." "It will not be denied," say the court, in continuation, "that the owner might have removed his slaves from this state at any moment and for any purpose he pleased." And it is laid down as a general rule, to which there is no exception, unless by express statutory provision, "that the owner of property may, by his will, direct his executors to dispose of it in any way which *he* could."

The importance of the case to the parties and to the country, the zeal with which the able counsel who argued it resisted the conclusions of the court, as well as the agitation it has produced in the country, are the reasons which have induced me to adduce this superadded authority to support the judgment of the court.